Docket No. 102225.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AARON JAMAR HOUSTON, Appellant.

*Opinion filed April 17, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Following a jury trial in the circuit court of Peoria County, defendant, Aaron Houston, was convicted of armed robbery (720 ILCS 5/18–2(a) (West 2000)). The circuit court sentenced him to 20 years' imprisonment. A divided appellate court affirmed defendant's conviction and sentence (*People v. Houston*, 363 Ill. App. 3d 567 (2006)), and we granted leave to appeal (210 Ill. 2d R. 315). The case is now before us a second time following our limited remand in *People v. Houston*, 226 Ill. 2d 135 (2007) (*Houston I*). In that opinion, we retained jurisdiction and remanded the cause to the circuit court for reconstruction of the *voir dire* record. *Houston I*, 226 Ill. 2d at 154.

## BACKGROUND

As noted in our opinion in *Houston I*, defendant's conviction arose from his participation in a robbery at a Peoria pizzeria. At the beginning of defendant's trial, defense counsel waived the presence of the court reporter for *voir dire*. Before both this court and the appellate court, defendant argued that this waiver constituted ineffective assistance by his trial counsel. Having received the reconstruction of the *voir dire* record from the circuit court, we proceed with our review of defendant's claims regarding the impropriety of the *voir dire* and selection of the jury. The facts relevant to defendant's *voir dire* claims and their procedural background were presented in *Houston I*, 226 Ill. 2d at 137-40, and we need not repeat them here. We also consider defendant's separate claim concerning trial counsel's failure to submit a jury instruction. Additional facts are set forth below as needed.

## ANALYSIS

### *Voir Dire* Proceedings

In *Houston I*, this court determined that defense counsel's waiver of the court reporter for *voir dire* constituted deficient performance, and defendant therefore satisfied the first prong of the test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), for reviewing claims of ineffective assistance. *Houston I*, 226 Ill. 2d at 148. We now turn to whether the second prong of the *Strickland* test has been met.

This second prong requires a showing that counsel's deficient performance resulted in prejudice. A defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Peeples*, 205 Ill. 2d at 513. In order to prevail on a claim of ineffective assistance, a defendant must satisfy both the performance and the prejudice prongs of *Strickland*. *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

In the case at bar, defendant's *pro se* motion for a new trial included a complaint about the composition of his jury. In this motion,

defendant stated that he "felt a predjudice [*sic*] and discrimanating [*sic*] patter[n] going on with the jury," which he noted consisted of "eleven white people and one black person."[1] We determined in *Houston I* that this complaint amounted to a claim under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

In *Batson*, the Supreme Court held that it was a violation of the equal protection clause for the prosecution to use a peremptory challenge to exclude a prospective juror solely on the basis of race. Under *Batson*, a three-step process is employed to evaluate claims of discrimination in jury selection. First, the defendant must establish a *prima facie* case of purposeful discrimination by demonstrating that relevant circumstances give rise to an inference that the prosecutor exercised peremptory challenges to remove panel members based on their race. *People v. Williams*, 173 Ill. 2d 48, 70-71 (1996). Once a *prima facie* case has been established, the burden shifts to the State to articulate a race-neutral reason for excluding each of the venirepersons in question. *Williams*, 173 Ill. 2d at 70; *People v. Williams*, 209 Ill. 2d 227, 244 (2004). Finally, the trial court considers those explanations and determines whether the defendant has met his burden of establishing purposeful discrimination. *Williams*, 209 Ill. 2d at 244; *Williams*, 173 Ill. 2d at 70-71.

In the case at bar, the circuit court of Peoria County submitted to this court a reconstruction of the *voir dire* record consisting of two items: (1) transcripts of the proceedings that resulted in the creation of a "Bystander's Report Re: Voir Dire Reconstruction," and (2) the bystander's report itself, "certified per Supreme Court Rule 323," dated November 21, 2007, and signed by counsel for defendant and the State. This second item, the bystander's report, includes a summary of the jury-selection proceedings at defendant's trial, along with seven exhibits containing documents that apparently were used in assembling the report. Exhibit 1 is a list of the names of the 29 members of the jury panel. Exhibits 2 through 5 consist of juror profile

---

[1] Defense counsel's subsequent motion for a new trial also referred to the composition of the jury. The motion noted, *inter alia*, that "of the twelve jurors in this cause, there was only one black."

questionnaires–with photos–for the 29 panel members.[2] Three of these 29 appear to be African-American. Included in exhibit 2 are juror profile questionnaires for the 12 members of the final jury, which included one African-American. Also included in exhibit 2 is the questionnaire for the alternate juror. Exhibit 3 consists of juror profile questionnaires for the seven venire members who were excused by the defense, and exhibit 4 includes questionnaires for the six members excused by the State. Exhibit 5 includes questionnaires for the three panel members excused by the court. Exhibit 6, which is a jury seating diagram, lists the names of the panel members who were called for each seat, including those who were excused and those finally seated. Exhibit 7 is the court clerk's thumbnail summary of the trial, a three-page document that includes, among other items, the names of the final jurors; the names of the panel members excused by the court, the State, and the defense; and the names of the witnesses testifying at trial, along with the dates and times of their testimony.

Our review of the reconstruction proceedings and the resulting bystander's report reveals the following pertinent information. The reconstruction proceedings were conducted by a judge other than the judge who presided at defendant's trial. David Gast, the prosecutor at defendant's trial, appeared for the State in the *voir dire* reconstruction proceedings. A public defender was appointed to represent defendant, whose trial counsel had since retired from the practice of law. No information was available from defendant's trial counsel.

According to the bystander's report, the judge at defendant's trial questioned potential jurors in groups of four, and counsel for the State and the defense asked supplemental questions. "The questions posed by the Court were standard questions regarding availability, bias, prejudice, prior service, burden of proof, presumed innocence of the Defendant, duties as jurors, among other things, as well as any personal questions gleaned from the Juror Questionna[i]res." No notes were taken or memoranda created regarding the supplemental questioning by the attorneys.

---

[2]Attached to each venire member's juror profile questionnaire is a photocopy of the venire member's driver's license photograph.

-4-

Attached to the juror profile questionnaires of each of the six panel members challenged by the State are photocopies of the panel members' drivers' license photographs. Of those six panel members, one–Tracy Mosley–appears to be African-American, and the remainder appear to be Caucasian. Gast, the prosecutor at trial, recalled the particular reasons for four of the challenges. These panel members "either had a criminal conviction or a close family member with a criminal conviction." Included in these four was Mosley, who checked the blank marked "Yes" on her juror profile questionnaire in answer to the question of whether she or a family member had ever been convicted of a criminal offense other than a traffic ticket. Gast did not recall the reasons for challenging the other two panel members, each of whom was born in 1928. As noted, neither of them appears to be African-American.

Of the three venire members excused by the court, one appears to be African-American. Gast recalled that this panel member was excused because his spouse was employed by the county sheriff as a courthouse security officer.

The bystander's report concludes by stating:

> "After investigating all sources for this report, the reasons given, if any, for the particular challenges made by the State or the Defense, or \*\*\* by the Court in removing three potential jurors for cause, further information is otherwise unknown and cannot be ascertained by any other means."

Having reviewed the bystander's report and the transcripts of the reconstruction proceedings, we see no clear indication of a *prima facie* case of racial discrimination. First, we do not find an impermissible pattern of strikes against African-Americans or a disproportionate use of peremptory challenges against African-American venirepersons. See *Williams*, 173 Ill. 2d at 71. As previously noted, the State challenged six venirepersons, only one of whom appeared to be African-American. The remaining five appeared to be Caucasian. This does not suggest an impermissible pattern of strikes against African-Americans, nor does it indicate a disproportionate use of peremptory challenges against African-American venirepersons. Second, we find no appreciable disparity between the level of African-American representation in the venire and the level of such representation in defendant's jury. See *Williams*, 173

Ill. 2d at 71. Here it is undisputed that there was one African-American juror. In a jury of 12 persons, where 1 is African-American, the level of African-American representation is 8.3%. According to the bystander's report, the venire as a whole consisted of 29 persons. Of those 29 persons, 3 appear to be African-American. The representation of African-Americans in the venire was thus 10.3%. While the level of representation of African-Americans in the venire was slightly higher than in the jury, the difference between the two is just 2%, which is negligible. The level of African-American representation in the jury was essentially the same as the level in the venire.

It is true that defendant and Mosley were both African-American, and the shooting victim in the robbery was Caucasian. See *Williams*, 173 Ill. 2d at 71. However, when compared with the totality of relevant facts (see *People v. Rivera*, 221 Ill. 2d 481, 500 (2006)), this does not give rise to an inference of discriminatory purpose.

We conclude that, even if a court reporter had recorded the *voir dire* proceedings, defendant would not have been able to establish a *prima facie* case of purposeful discrimination. Moreover, even if a *prima facie* case had been established, it appears that the State could have articulated a race-neutral reason for excusing Mosley: either she or a close relative had been convicted of a criminal offense. It follows that, under these circumstances, the prejudice prong of the *Strickland* test has not been met. It cannot be said that, but for defense counsel's waiver of the court reporter for *voir dire*, there is a reasonable probability that the result of the proceeding would have been different. See *Peeples*, 205 Ill. 2d at 513. We reject defendant's claim that his counsel's waiver of the court reporter for *voir dire* constituted ineffective assistance.

Defendant's second claim regarding the impropriety of the *voir dire* proceeding is that he was deprived of due process when the trial court allowed jury selection to proceed with no court reporter present. This argument arises from essentially the same basis as defendant's claim of ineffective assistance regarding jury selection: counsel's affirmative waiver of defendant's right to the presence of a court

reporter during *voir dire*.[3] In each instance, defendant's claim is that, because of the lack of a *voir dire* record, he was prejudiced in that he was unable to establish that his jury was improperly seated in violation of *Batson*. As a result of our remand in *Houston I*, we were supplied with a reconstructed *voir dire* record, which enabled us to review defendant's claims regarding improper jury selection. Having reviewed these claims under the rubric of ineffective assistance of counsel, and having determined–under *Strickland*–that defendant suffered no prejudice, we are satisfied that there was no due process violation. We reject defendant's claim that the trial court, in allowing *voir dire* to proceed without a court reporter present, deprived him of due process.

Jury Instruction on Identification

Defendant next argues that his trial counsel was ineffective for failing to submit a jury instruction on identification. According to defendant, "identification of the robber was the primary issue in this case," and defense counsel therefore was ineffective for failing to tender Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th), which deals with the circumstances of identification.[4] The State counters that there was no

---

[3]As this court has stated, waiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right. *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). This accurately describes counsel's conduct in the case at bar, where he affirmatively agreed that the presence of a court reporter for *voir dire* was unnecessary. Waiver in this sense is different from forfeiture, which is simply the failure to make the timely assertion of the right. *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005).

[4]IPI Criminal 4th No. 3.15 provided:
> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
> [1] The opportunity the witness had to view the offender at the time of the offense.
> [or]
> [2] The witness's degree of attention at the time of the offense.

-7-

issue of eyewitness identification at trial, and counsel therefore was not ineffective for failing to tender a jury instruction on identification.

Defendant's claim of ineffective assistance of counsel is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under this test, a defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). In order to prevail on a claim of ineffective assistance, a defendant must satisfy both the performance and prejudice prongs of *Strickland*. *Evans*, 209 Ill. 2d at 220.

In reviewing defendant's claim that his counsel was ineffective for failure to tender a jury instruction, we first recount the pertinent evidence presented at trial. The charge against defendant arose from a robbery at a Peoria pizzeria in July 2002. The State's first witness was Wesley Fleming, the acting manager of the pizza restaurant where the robbery occurred. Fleming testified that on July 11, 2002, at about 1 a.m., he was in the process of closing for the day when two men approached him. Fleming did not hear or see the men enter the restaurant. As they approached, Fleming noticed that they were wearing dark, baggy clothing and some sort of cloth obscuring their faces, like a mask. Because of the masks, Fleming could not see the men's faces, but he did note that they were of different heights.

The shorter of the two men pointed a handgun at Fleming and demanded that he open the safe. Fleming told the man that the safe

---

[or]
  [3] The witness's earlier description of the offender.
[or]
  [4] The level of certainty shown by the witness when confronting the defendant.
[or]
  [5] The length of time between the offense and the identification confrontation."

-8-

was time-locked. The man then ordered Fleming to open the cash register, but Fleming explained that the computer which controlled the register was already shut down. The man responded, "Don't fuck with me, don't fuck with me," and he shot Fleming in the leg. Fleming took out his wallet and offered it to the men, who took it and left.

Fleming testified that employees sometimes propped open the rear door of the restaurant if they had to go outside for a short time, but it was normally closed and locked. The door could be opened from the outside by entering a combination on a keypad. Fleming stated that he believed the door was closed before the robbery, but he could not be certain. He said it looked closed, but he had not specifically checked it before the robbery.

During the time that the robbery was taking place, the taller of the two men was standing watch over another employee, a driver, who was also in the restaurant. The employee, Andrew Albee, corroborated Fleming's account of the incident. Albee testified additionally that he was in the back of the restaurant washing dishes when he heard the rear door open and turned to see the two men enter. The shorter of the two men had a gun and told Albee to lie down near the cash register. Albee testified that the taller man was about 6 feet in height,[5] and the shorter man was 5 feet 8 or 5 feet 9 inches. Albee added that the rear door of the restaurant was closed and locked before the men entered. According to Albee, if the door had been open, he would have noticed. Albee testified further that after the men left the restaurant, he found a broomstick under the rear door, propping it open.

Peoria police officer Terry Esser testified that he was patrolling the area near the pizza restaurant at about 1 a.m. on July 11, 2002. When he looked toward the restaurant, he saw two African-American males running from the rear of the establishment. Esser drove over to investigate and saw the men attempting to enter a black two-door car that had pulled up near them. At the same time, two persons who were in the car got out, and all four individuals fled the area on foot. The black vehicle began rolling with no one inside, so Esser left his

---

[5]The presentence investigation report lists defendant as 6 feet 1 inch in height.

squad car and entered the vehicle to stop it. Esser then returned to his squad car and drove after the four fleeing individuals. After a few blocks, he parked his squad car and continued the pursuit on foot, toward a wooded area. Esser eventually concentrated on just one man. According to Esser, the man was wearing dark pants and a yellow or orange shirt.

Esser lost sight of the man, but at about that time other officers arrived, including a canine unit. As Esser and the other officers searched the area, they found a black wig lying along a roadside. Esser searched further and found an African-American man lying on the ground just inside the wooded area. The man fled, and Esser pursued him on foot. During the chase, Esser and other officers crossed over a fence and briefly lost sight of the suspect. He was later found lying on the ground, and was taken into custody. According to Esser, the man was wearing dark pants and a white T-shirt.

Esser identified defendant in court as the man he had chased and arrested. On cross-examination, Esser acknowledged that he lost sight of the man on two occasions during the chase.

Peoria police officer Mike Patterson testified that, after being called to the scene of the robbery, he initially canvassed the area for suspects. Patterson then towed the car which Esser had seen, a black 1985 Chevrolet Monte Carlo. According to Patterson, the vehicle was registered to Erin Bush, whose address was the same as defendant's. Patterson spoke to Erin Bush, who told him that defendant was her son.

Detective Michael Mushinsky testified that he and Detective Fred Ball interviewed defendant at the Peoria police station at 8 p.m. on July 11, 2002. Defendant told the detectives that he and his brother, Tobias, and a third person had gone to the pizza restaurant, and defendant and Tobias entered through the rear door. Defendant stated that he was an employee of the restaurant and had gone there for leftover pizza. Defendant told the detectives that after he and Tobias entered the restaurant, Tobias pulled out a pistol and demanded money from the manager. According to defendant, he had seen Tobias get the gun earlier that day, but did not realize he had brought it with him to the restaurant. Defendant stated further that Tobias pointed the gun at the restaurant manager and demanded that he open the safe. The gun went off, and defendant and his brother took the manager's

wallet and ran out through the rear door. When they reached the parking lot, they "jumped into the car," but when they saw the police pulling up, "they all jumped out of the car and ran their separate ways." Defendant said they did not know the area well, so he and the others simply "took off running." Defendant added that he was wearing fake hair, which he removed at one point while running through "some woods." Mushinsky testified that he and Ball "asked him why he was wearing a fake hairpiece and had on a mask if he was just going in there to get some leftover pizza." Defendant answered, "I don't know."

Defendant testified in his own behalf. He stated that he was 18 years old and was an employee of the pizza restaurant where the robbery took place. According to defendant, he went to the pizza restaurant at noon or 1 p.m. on July 10, 2002, to get his paycheck, and then returned home. He drove to the restaurant and back in his own car, a white Chrysler Fifth Avenue. That evening, defendant was drinking "heavily" and smoking marijuana with his cousin and some other individuals. At some point in the evening–defendant did not recall the exact time–he left in his car and drove to see a female friend at her grandmother's house, which was in the area of the pizza restaurant. On the way there–sometime between midnight and 3 a.m.–defendant was driving in the area of the pizza restaurant when he saw a police car "creeping out" on him. Defendant stated that he was "nervous" about being stopped by the police because he had been drinking heavily, he had "two bags of marijuana in [his] pocket," and he had no insurance. In order to avoid being pulled over, defendant pulled ahead of the police car, drove a little farther, parked his car, and got out. When he looked back, he saw the police car approaching, and he started to run. The officer got out of his car and began chasing defendant, who ran until the officer told him to stop and get down on the ground. At that point, a canine unit was approaching. Defendant testified that he was afraid the dog was going to attack him, so he got up and started running again, toward a wooded area. He said he discarded the marijuana in the woods. A short time later, defendant was stopped in the woods by police with guns drawn. The police took him back to a squad car and brought him to the police station.

Defendant testified that he did not go to the pizza restaurant that night. He also denied that the restaurant gave away leftover pizza.

According to defendant, the restaurant threw it away because it was cold.

On cross-examination, defendant was unable to explain how his mother's car happened to be near the pizza restaurant at the time of the robbery. Defendant also denied making any statement to police about the robbery. According to defendant, he made "no statements concerning *** a robbery."

As is shown by the evidence presented at trial, there was no identification of defendant as one of the men who committed the robbery. The two restaurant employees who witnessed the robbery both testified that they could not identify their assailants because the robbers wore masks. Police officer Terry Esser identified defendant as having been near the scene of the crime. Esser testified that, following a chase, defendant was taken into custody in a nearby wooded area. Esser did not identify defendant as one of the robbers.

Indeed, in closing argument, defense counsel argued repeatedly that there was no identification of defendant. Counsel stated: "There was a tall guy, a short guy, nobody was able to identify anybody in there. There was not one iota of evidence that said they were able to identify [defendant] in that place." Shortly thereafter, counsel stated: "There was no identification by anyone in this court during this trial that identified or pointed out and said this was he." Counsel added: "It's a grave responsibility that you're going to take into that jury room, ladies and gentlemen, without a positive identification or even a half-way identification, really no identification at all of anyone here." In rebuttal argument, the State agreed: "We don't live in a perfect world and this is not a perfect case. There is no I.D. I'm not going to tell you there is. I didn't hear any evidence of an I.D., because there was no I.D."

Identification was not the main issue in this case, notwithstanding defendant's arguments to the contrary before this court and the appellate court. Rather, the State's case against defendant was based on his statement to police and on other, corroborating evidence, which we have detailed above. In his statement to police, for example, defendant admitted being present at the restaurant during the robbery, but attempted to mitigate blame by asserting that he went to the restaurant to get leftover pizza. However, when asked by police why he was wearing a wig and a mask to get leftover pizza, defendant

-12-

answered, "I don't know." The jury also heard testimony that the black car seen by Officer Terry Esser near the restaurant the night of the robbery was registered to defendant's mother. In his testimony at trial, defendant denied going to the pizza restaurant the night of the robbery. On cross-examination, however, he was unable to explain how his mother's car happened to be near the restaurant at the time of the robbery.

In sum, the main issue for the jury was not eyewitness identification, but rather which of the various versions of events presented at trial should be believed. We conclude that, in these circumstances, there is no reasonable probability that defendant would have been acquitted if IPI Criminal 4th No. 3.15 had been tendered and given. Defendant has failed to show that he was prejudiced by defense counsel's failure to tender this jury instruction on identification. We therefore reject defendant's claim that his counsel was ineffective for failure to submit this instruction. See *Peeples*, 205 Ill. 2d at 513-14; *Evans*, 209 Ill. 2d at 219-20.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the appellate court.

*Affirmed.*