# Illinois Official Reports

## Appellate Court

---

### *People v. Bradford*, 2019 IL App (4th) 170148

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AHQUAVIOUS BRADFORD, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-17-0148 |
| Filed<br>Modified upon<br>denial of rehearing | February 1, 2019<br><br>February 22, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 16-CF-730; the Hon. Robert C. Bollinger, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Eric E. Castañeda, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Justices Knecht and Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1     In June 2016, the State charged defendant, Ahquavious Bradford, with two counts of aggravated discharge of a firearm. The State dismissed one of the counts, and in November 2016, the trial court conducted a jury trial. The jury found defendant guilty on a single count of aggravated discharge of a firearm, and the court sentenced him to 12 years of imprisonment with 2 years of mandatory supervised release.

¶ 2     On appeal, defendant argues he was denied effective assistance of counsel because trial counsel failed to object to the conclusions of the State's firearm identification expert, which were unsupported by a proper foundation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In June 2016, Jasmine Adams's brother posted a picture on Facebook and asked if anyone could identify the person. Adams testified she recognized the man in the picture as defendant because they went to school together, and she had texted back and forth with him a "couple of times." Later that June day, she called defendant to let him know her brother was looking for him. Once Adams identified defendant as the man in the picture, she and her brother, along with some other people, drove around looking for defendant. Adams and her brother spotted defendant and pulled over. As they were getting out of the car and telling defendant to come to their car to talk, defendant said, "What's up? What's up, bro?" and then moved behind a tree and started shooting at them, firing five to seven shots. During the shooting, Iisha Dean, a resident of the community where the shooting occurred, was sitting in her car talking to some of her neighbors when she heard four or five gunshots and saw someone pointing a gun at a truck. Adams and her group drove off.

¶ 5     After the shooting, police officers stopped the car containing Adams, her brother, and other family members and friends. Upon stopping the car, officers found evidence of what appeared to be bullet holes on the driver's side and three bullets from inside the vehicle. They also found a gun under the passenger's seat, drugs, and a weight scale. The officers inquired into the shooting, and Adams said defendant shot at them. Police officers executed a search of the residence in which defendant was staying at the time. The officers found defendant hiding in the attic, lying facedown in the insulation. A handgun was found in the bedroom, the closet to which contained access to the attic. The handgun was located in the drawer of a dresser located in the same bedroom, within three to four steps from the entryway to the attic.

¶ 6     As a result of the stop, Adams was charged with aggravated unlawful use of a weapon, which was ultimately dismissed by the State in return for her testimony in this case. In addition, the State agreed to obtain an order quashing an outstanding warrant she had in an unrelated misdemeanor case.

¶ 7     Defendant was charged with two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)), one of which was dismissed by the State. The remaining count alleged defendant knowingly discharged a firearm in the direction of a vehicle, which he reasonably should have known to be occupied by a person. In November 2016, the case proceeded to a jury trial.

¶ 8     Carolyn Kersting, a 30-year veteran with the Illinois State Police, worked as a forensic scientist specializing in firearms identification since 2001. She was called to testify about the

forensic examination of the firearm taken from defendant's residence, along with her examination of both test-fired bullets and those retrieved from Adams's vehicle by the police. She was tendered as an expert in firearms identification, and defendant's counsel neither questioned her thereon nor objected to her being so qualified. Kersting testified about the examination process in general and then explained what she did in this case, discussing both general class characteristics such as rifling and caliber and individual characteristics peculiar to a particular firearm "through the manufacturing process or through rust, corrosion, [or] use and abuse damage." She explained the use of a comparison microscope when analyzing bullets to look for individual characteristics in order to determine whether a particular bullet was fired from a particular firearm.

"We use a comparison microscope for making decisions on fired evidence and test shots. And that is two microscopes combined together by an optical bridge, that means we can look at two items at the same time and take a hairline and move them back and forth, and at this point we're looking at those individual characteristics to see if the pattern reproduces."

¶ 9 Kersting explained how she first fired test shots in order to examine them microscopically, looking for particular patterns reproduced from test to test. She then compared those to the bullets in evidence, looking for similar patterns. While it is not always possible to make a positive identification, Kersting was able to in this case based on the aforementioned method. As a result, it was her professional opinion that the fired bullets submitted as evidence were fired by the firearm seized from defendant's residence. On cross-examination, counsel requested more detail as to how she was able to form her conclusion. She explained:

"When we make a finding, we are using the individual characteristics that are transferred to the cartridge case or the bullets in the form of the firing process. So in bullets, the individual characteristics within the bore are transferred to the bullet through the firing process. So these individual characteristics or complex microscope patterns will be similar from bullet to bullet fired within that firearm. When I fired the test shots, I put the test shots on the microscope to see if there were reproducing patterns, and then aligned those—those markings with different ink. And then I put my test—correction—I put the evidence bullet up on the scope in comparison to the test and I was able to find that the patterns reproduced from test to the fired evidence."

¶ 10 Defendant's counsel asked about the similarity of impressions made by the same machine of a particular manufacturer, and Kersting noted "a lot of studies on this," which found the tool used to bore the barrels changes slightly with each use, thereby imparting "a different set of individual characteristics of patterns." Although she could not recall the authors of studies by name or their dates of publication, she said she read them herself, that they could be found in the literature, and she was aware they have existed "over the time of firearm identification" and have been "reverified" as true. Defendant presented no evidence. The jury convicted defendant of aggravated discharge of a firearm, and the trial court sentenced him to 12 years' imprisonment in the Illinois Department of Corrections followed by 2 years of mandatory supervised release.

¶ 11 This appeal followed.

II. ANALYSIS

Defendant argues his trial counsel provided ineffective assistance of counsel by failing to object to the State's firearm identification expert giving her opinion without properly laying the foundation. We disagree.

A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 687, 694). " 'Effective assistance of counsel refers to competent, not perfect representation.' " *Evans*, 209 Ill. 2d at 220 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240 (1984)). "It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection." *People v. Holmes*, 397 Ill. App. 3d 737, 745, 922 N.E.2d 1179, 1187 (2010).

To establish the second prong of *Strickland*, "[a] defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4, 890 N.E.2d 424, 426 (2008). A "reasonable probability" has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Houston*, 229 Ill. 2d at 4. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

Defendant contends it was error for his counsel not to object to what he characterizes as an "unreliable firearm expert's testimony" due to what defendant claims was an inadequate foundation for her testimony. In support of his "first prong" argument, defendant relies on *People v. Safford*, 392 Ill. App. 3d 212, 910 N.E.2d 143 (2009). In *Safford*, 392 Ill. App. 3d at 227, the court found there was no proper foundation for the testimony of the State's expert in latent fingerprint identification where the expert did not provide a sufficiently detailed reason for his opinion. As was noted by the State, "*Safford* has been heavily criticized, and characterized as an 'outlier.' " *People v. Robinson*, 2018 IL App (1st) 153319, ¶ 19, 105 N.E.3d 957 (citing *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41, 984 N.E.2d 491, *People v. Wilson*, 2017 IL App (1st) 143183, ¶¶ 41-42, 86 N.E.3d 1231, and *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 120-28, 66 N.E.3d 360). The *Robinson* court went on to note it was unable to find any published case that followed *Safford*'s reasoning. *Robinson*, 2018 IL App (1st) 153319, ¶ 19. Under Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), an expert "may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Under Rule 705, the burden is on the defense " 'during cross-examination to elicit the facts underlying the expert opinion.' " *Negron*, 2012 IL App (1st) 101194, ¶ 42 (quoting *Wilson v. Clark*, 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1327 (1981)). The court in *Simmons* continued the criticism of *Safford*, noting the majority's holding ran counter to Rule 705 and a number of Illinois Supreme Court cases concluding that the basis of an expert's opinion is a matter for cross-examination since it

goes to the weight to be given the expert's testimony and not its admissibility. *Simmons*, 2016 IL App (1st) 131300, ¶ 121 (" '[T]he basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence ***.' " (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 26, 787 N.E.2d 796, 810 (2003))).

¶ 17       Here, Kersting testified to her methodology, procedure, and the purpose of her examination of test-fired slugs and the bullets submitted by the police, all of which were admitted into evidence. She explained what she was looking for and how she went about testing it. She then opined that based upon her examination of the two samples of fired bullets, the submitted slugs were fired from the same gun. Defendant's counsel immediately asked for more detail on cross-examination and was provided it. Thus, there was a sufficient foundation, which precluded defendant's counsel from objecting, and therefore, there was no deficient performance.

¶ 18       Defendant also fails to satisfy the second "prejudice" prong. Despite defendant's claim, the expert's opinion was neither the only nor the most damaging evidence against him. At trial, the State presented evidence of the police officers' execution of a search on the residence, in which defendant was staying at the time, a short time after the shooting, where they found him hiding in the attic, facedown in the insulation with the gun only a few steps from the attic door. Although Adams was impeached by her deal with the State, her testimony was inevitably given more weight once the officers discovered defendant and the gun. That, coupled with the evidence of flight, as well as the testimony of Dean, who saw someone shooting at a vehicle with people inside, does not lead us to believe there was a reasonable probability the jury would have found defendant not guilty even without the ballistics evidence. Therefore, even if defense counsel objected and had Kersting's testimony omitted, there is no reasonable probability the outcome would have changed. Since there was no proper basis upon which to exclude the expert testimony, defendant's ineffective assistance of counsel claim fails under both prongs of *Strickland*.

¶ 19                                    III. CONCLUSION
¶ 20       For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2016).

¶ 21       Affirmed.