**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170214-U

Order filed January 28, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0214 Circuit No. 13-CF-243 |
| LATEEF MAURICE JACKSON, | ) ) ) | Honorable Richard A. Zimmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justice Holdridge concurred in the judgment.
Justice McDade, dissented.

**ORDER**

¶ 1        *Held*:  The trial court appropriately dismissed defendant's postconviction petition following a third-stage evidentiary hearing where defendant failed to prove that he received ineffective assistance of trial counsel.

¶ 2        Defendant, Lateef Maurice Jackson, appeals from the denial of his postconviction petition following a third-stage evidentiary hearing. He argues that the trial court erred in denying his request for postconviction relief where trial counsel was ineffective for failing to conduct an adequate pretrial investigation. We affirm.

I. BACKGROUND

In March 2013, the State charged defendant by information with two counts of aggravated battery (720 ILCS 5/12-3.05(b)(1), (2) (West 2012)). Count I alleged that defendant knowingly caused bodily harm to K.R.L., a child under the age of 13, by punching him repeatedly in the stomach. See *id.* § 12-3.05(b)(2). Count II alleged that defendant knowingly caused bodily harm to K.R.L. by punching him repeatedly in the abdomen thereby bruising an organ in his abdomen. See *id.* § 12-3.05(b)(1).

A. Defendant's Trial and Direct Appeal

The underlying facts of this case are fully set out in our opinion on direct appeal. See *People v. Jackson*, 2015 IL App (3d) 140300. We provide a brief summary here.

Four-year-old K.R.L. testified that defendant hit him in his stomach with a fist while his hands and feet where tied up with clothes.

K.R.L.'s mother, Pilcher, testified that the night before the incident, she gave K.R.L. a shower and saw no marks on his body. The next morning, defendant came over to babysit K.R.L. and his sister while Pilcher worked. When she returned home from work around 3:30 p.m., the children were sleeping. Defendant left the house a few hours later. After defendant left, K.R.L. woke up complaining of stomach pain. Pilcher removed K.R.L.'s shirt and saw bruises on his abdomen. K.R.L. told her that defendant, who he referred to as "mommy's friend," tied his hands and feet up with pants and a shirt and punched him in the stomach to "make him stronger."

Pilcher's neighbor, Massey, testified that she went to Pilcher's apartment after being summoned there by Pilcher and observed bruising on K.R.L.'s abdomen and back. K.R.L. told her that "mommy's friend" punched him in the stomach to make him stronger after tying him up with a pair of pants.

¶ 10    Emergency room physician, Dr. Michael Barr, opined that K.R.L.'s injuries occurred between one hour and two days before he came to the emergency room. Pediatric surgeon, Dr. Richard Pearl, opined that K.R.L.'s injuries resulted from "a real beating" rather than something trivial like a fall. Pediatric radiologist, Dr. Craig Mitchell, reviewed a CT scan of K.R.L.'s abdomen and pelvis taken the day after the incident and indicated the trauma occurred within 24 to 48 hours of the scan. Detective Marcy O'Brien visited K.R.L. at the hospital the day after the incident and he told her that "mommy's friend," who he identified in a photographic lineup as defendant, punched him in the stomach while his hands and feet were tied up.

¶ 11    Lorenzo Walker testified for the defense that he picked defendant up at Pilcher's house sometime between 5:45 p.m. and 6:20 p.m. on the date of the incident. Defendant did not appear angry, upset, or worried. Defendant took a phone call while in Walker's vehicle concerning a sick child. Walker could offer no insight into what happened earlier that day.

¶ 12    Following arguments, a Rock Island County jury found defendant guilty of both counts of aggravated battery. The trial court sentenced defendant to 14 years in prison on count II, but it dismissed count I, finding it to be a lesser-included offense. Defendant filed a motion to reconsider his sentence, which the court denied following a hearing. This court affirmed defendant's conviction and sentence on direct appeal. See *Jackson*, 2015 IL App (3d) 140300.

¶ 13                              B. Postconviction Proceedings

¶ 14    In June 2016, defendant filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2014)). He asserted that trial counsel provided ineffective assistance of counsel on 11 different bases, including, in pertinent part, that counsel failed to conduct an adequate pretrial investigation. Defendant maintained that counsel failed to interview or failed to "adequately interview" certain witnesses that were

identified in a September 2013 letter to counsel. The State filed a response asking the court to dismiss the petition. Following a February 2017 hearing, the court denied the State's request and advanced defendant's petition to the third stage.

¶ 15    In March 2017, the trial court conducted an evidentiary hearing. For purposes of this appeal, we limit our discussion of the evidence introduced at the hearing to that which is relevant to our disposition.

¶ 16    Defendant testified, in pertinent part, as follows. He retained Eric Puryear to represent him in this case. Shortly thereafter, he sent Puryear a letter containing a list of witnesses and a synopsis as to what those witnesses would testify. The trial court admitted this letter into evidence.

¶ 17    The day after receiving defendant's letter, Puryear provided the State with a witness disclosure list that included many of the witnesses defendant identified. The trial court admitted the witness disclosure list into evidence.

¶ 18    Puryear did not contact any of the witnesses identified in defendant's letter. Puryear spoke to Walker, the only witness who testified on defendant's behalf, "just a couple minutes" before his trial testimony.

¶ 19    Travis Spurgetis testified that he met defendant 10 to 12 years ago and "he's like a brother to me." Spurgetis identified his affidavit, which the trial court later admitted into evidence. He recalled stating in the affidavit that he spent most of the day with defendant and the children on the day of the incident and that "nothing on this day was any different than any other day *** that [he] had spent with [defendant] in the years prior." They "had lunch and spent time with *** the kids that were there and we'd just hang out." The "kids were always happy any time [he] was around." He did not see defendant batter anyone on that day or on any day prior. Spurgetis described the day as "relatively happy." He admitted he did not spend the entire day with

defendant. Spurgetis also recalled being contacted by a police detective while vacationing who asked him what he and defendant "had done that day." He asked the detective to call him back when he was home from vacation; she never called him again.

¶ 20      On cross-examination, Spurgetis testified that while he would not have provided an alibi for Jackson, he would have "express[ed] what we had done that day and that there was nothing off to me." Spurgetis had felony convictions for a drug-related offense 10 years before and a robbery conviction prior to that.

¶ 21      Walker testified that he met defendant in seventh grade and that the two were "like brothers." They talked nearly every week. Walker testified at defendant's trial. He spoke to Puryear for the first time five minutes before testifying at trial. Walker did not know he was going to be a witness until he was told to leave the courtroom on the day of trial. He recalled his trial testimony as "basically [stating] I picked him up from a residence in Moline [on March 13, 2013,] and then took him to a residence in Davenport, and I think [I] heard a conversation in that, in that route between Moline and Davenport." The conversation that he overheard "ha[d] to do with the kid that he was watching being sick" and telling the person on the other end of the telephone what the child ate that day and when he napped. Walker observed nothing out of the ordinary in defendant's demeanor. Defendant did not appear angry, upset or worried. When asked, "Is there any other additional information that you would have liked to testify to at trial that the attorney didn't asked [*sic*] you questions about," Walker responded, "Well, I don't pretty much know what happened [that day]" and all he could testify to was picking him up and giving him a ride to Davenport "and that's pretty much it." Walker identified his affidavit, which the trial court admitted into evidence.

¶ 22      The trial court took judicial notice of the record and the defense rested.

¶ 23    The State then called Puryear to testify. Puryear testified that he practiced in Illinois and Iowa and has been licensed since 2009 in Illinois and 2010 in Iowa. He represented defendant at trial. He also represented defendant on some related order-of-protection issues stemming from the same incident. The contract with defendant indicated that any attorney from Puryear's office may appear on defendant's behalf. He met with defendant several times and personally handled defendant's trial.

¶ 24    Puryear recalled receiving defendant's letter that contained a list of potential witnesses. Regarding that list of witnesses, he stated that:

> "[I]t's common in many cases—a lot of times a defendant will want to call a character witness even though character evidence is generally not permissible under our legal system. A lot of the things mentioned there are not permissible. I don't recall specifically having that discussion with [defendant], but it's a discussion that I have with a lot of people. You know, I can't call your brother's ex-girlfriend to say that you were a nice guy on one particular day. It's just not relevant to the issues in this case."

Puryear also recalled filing the witness disclosure list. While most of the witnesses on the list were not called at trial, he stated it's "better to have it and not need it than need it and not have it."

¶ 25    Regarding Spurgetis, Puryear stated:

> "If I recall correctly, he didn't have anything directly relevant to the alleged injury and the right timeframe. So calling him, the most I could hope for would be [defendant] is a nice guy who had a nice day and that doesn't really get us anywhere. On the downside to that,

if I recall correctly—and I would have to double-check—I believe he had a felony conviction as well, and I would rather not call a person who is just going to be impeached for no reason."

¶ 26    Puryear's trial strategy was to "try and prevent the State from proving beyond a reasonable doubt to the satisfaction of the jury that [defendant] committed the crime alleged." He would not have called any additional witnesses as none of them would have bolstered defendant's case but could harm it instead.

¶ 27    On cross-examination, Puryear testified he "definitely" read defendant's letter containing the list of witnesses defendant wanted him to call. Puryear met with Walker but did not personally interview any other witnesses nor did he recall any other person from his office doing so. He stated:

"A great many of the people listed on that disclosure and mentioned in his letter are essentially character witnesses, people who could say that he's a nice guy, that he wouldn't hurt them, and that's not a witness that I can call at trial, not a witness that has anything relevant to say. So there's no purpose for me in interviewing personally or having my staff interview those people."

¶ 28    Following arguments, defendant withdrew the majority of his claims. The trial court took the matter under advisement.

¶ 29    On March 24, 2017, the parties reconvened and the trial court announced its ruling denying defendant's petition for postconviction relief. The court found, in relevant part, that Puryear did nothing inappropriate by not interviewing certain witnesses because "[h]e didn't have any reason to believe that those witnesses had anything that would benefit the defendant at trial."

¶ 30   Defendant appeals.

¶ 31                              II. ANALYSIS

¶ 32   Defendant challenges the trial court's denial of his postconviction petition following a third-stage evidentiary hearing. Defendant's sole argument is that the court erred in denying his postconviction petition where trial counsel was ineffective for failing to conduct an adequate pretrial investigation.

¶ 33   We review a trial court's denial of a postconviction petition following a third-stage evidentiary hearing under the manifestly-erroneous standard. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A decision is manifestly erroneous if it contains an error that is ' " 'clearly evident, plain, and indisputable.' " ' *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (quoting *People v. Johnson*, 206 Ill. 2d 348, 357-60 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 34   Claims of ineffective assistance of counsel are assessed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 669 (1984); *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) "that counsel's performance fell below an objective standard of reasonableness" and (2) "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome of the trial. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A defendant's failure to establish either *Strickland* prong precludes a finding of ineffective assistance of counsel. *Id.* A reviewing court may dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, without determining whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

¶ 35 Here, defendant asserts that Puryear's "performance was deficient under the first prong of *Strickland* where he failed to speak to any other witnesses besides Walker prior to trial." Defendant concedes that, with the exception of Walker and Spurgetis, all other witnesses he identified in his letter to Puryear were "essentially character witnesses." Because Puryear interviewed Walker prior to his trial testimony, defendant limits his deficiency argument to Puryear's failure to interview Spurgetis, a witness defendant claims he was with on the date of the incident and one who possessed "valuable information that could have aided in [his] defense."

¶ 36 In his letter to Puryear, defendant identified Spurgetis as a potential witness who

"can testify how Detective O'Brian [*sic*] called him months after me being in jail, seeking out information. Has been over to [Pilcher's (K.R.L.'s mother's)] house with me and has seen me around her kids. He was in the truck with me when I picked up [K.R.L.'s sister] from school and her teacher came to the truck and said that [she] was hitting kids and telling them that she would beat them up and there [*sic*] mom \*\*\* said that [she] learned all of that from going downstairs to the neighbors. He can also testify that I took [K.R.L.] to get his hair cut at his shop numerous times."

¶ 37 Initially, we note that defendant's synopsis of Spurgetis's potential testimony, as provided in his letter to Puryear, does not indicate that he and Spurgetis were together on the date of the incident. Defendant concedes this detail in his brief. Nonetheless, he asserts "the fact that the detective had called Spurgetis should have been enough to alert Puryear that Spurgetis might have useful information that could be used in [his] defense." In support of his contention, defendant cites a number of cases that hold trial counsel's failure to conduct an adequate pretrial investigation

constitutes ineffective assistance. However, these cases are plainly distinguishable from the case at bar.

¶ 38     In *People v. Coleman*, 267 Ill. App. 3d 895, 899 (1994), the court found ineffective assistance where counsel failed to "conduct a pretrial investigation of any sort." Specifically, "[c]ounsel did not contact the victim, did not investigate the alleged crime scene, did not explore the victim's criminal background, did not attempt to find the other men nicknamed 'Beaver,' and did not pursue information in his possession which indicated that the victim had not been attacked as he reported to the police, but actually had been shot in his car." *Id.* In addition, "counsel never interviewed, subpoenaed or called as witnesses at least five people of whom he was aware would testify to defendant's whereabouts at approximately the time of the occurrence. Moreover, the testimony of one witness would have provided defendant with an alibi at the exact time of the occurrence." *Id.*

¶ 39     In *People v. Corder*, 103 Ill. App. 3d 434, 437-38 (1982), the court found counsel incompetent due to his failure to contradict the identification testimony of an undercover officer who stated the criminal was clean shaven when counsel had evidence that the defendant wore a beard before, during, and after the crime, or to interview any of the potential witnesses.

¶ 40     Likewise, in *People v. Davis*, 203 Ill. App. 3d 129, 141 (1990), the court found counsel incompetent where he failed to interview or call two eyewitnesses to the crime who were unable to pick the defendant out of a lineup and could rebut the one witness who positively identified defendant as the person responsible for the robbery.

¶ 41     In all of the above cases, trial counsel had clear opportunities to present evidence detrimental to the State's case. Here, however, trial counsel did not possess a similar opportunity. Rather, the information defendant provided Puryear indicated that Spurgetis would be no more

than a character witness who could attest to past observations between defendant and the children. We find Puryear's decision not to interview Spurgetis based on the information provided by defendant to be sound trial strategy and clearly not deficient. Further, we find it inconceivable that defendant would omit the fact that he and Spurgetis were together on the date of the incident if they indeed were.

¶ 42   Nonetheless, even assuming, *arguendo*, that counsel should have interviewed Spurgetis and put him on the stand to testify, defendant cannot satisfy the prejudice prong of *Strickland*. As noted, K.R.L.'s mom testified that K.R.L. had no bruises on his abdomen the night before the incident but had bruises the following evening after defendant babysat him. K.R.L. told his mom, his neighbor, and a police detective that defendant tied him up and punched him in the stomach. At trial, K.R.L. testified that defendant punched him in the stomach.

¶ 43   On the other hand, the record shows—and defendant concedes—that Spurgetis "would not have provided an alibi for [defendant]." At best, Spurgetis's testimony would indicate that he "spent most of the day" with defendant on the date of the incident, eating lunch and spending time with the children during which time he noticed nothing unusual about defendant's or the children's behavior. However, Spurgetis left the house in the "early evening" and could not offer any insight as to what transpired afterward. Pilcher did not mention Spurgetis being present at the home when she returned from work around 3:30 p.m. Walker's trial testimony is no more persuasive then Spurgetis's. Walker picked defendant up from the house on the date of the incident between 5:45 p.m. and 6:20 p.m. While defendant did not appear angry, upset, or worried, and he took a phone call while in Walker's vehicle concerning a sick child, Walker could offer no insight into what happened earlier that day. In fact, at the evidentiary hearing, Walker explicitly testified that he could not have offered any further testimony at trial because he did not "know what happened [that

- 11 -

day]" and all he could testify to was picking defendant up and giving him a ride "and that's pretty much it." In sum, even if both Spurgetis and Walker testified at defendant's trial, the result of the proceeding would not have changed. Accordingly, the trial court did not commit manifest error in denying defendant's postconviction petition on this ground.

¶ 44                                III. CONCLUSION

¶ 45        For the foregoing reasons, we affirm the judgment of circuit court of Rock Island County.

¶ 46        Affirmed.

¶ 47        JUSTICE McDADE, dissenting:

¶ 48        Lateef Jackson challenges, in a postconviction proceeding, the effectiveness of his trial counsel defending him against two charges of felony aggravated battery of K.R.L., a minor. Jackson was convicted of both charges and sentenced to 14 years in the Illinois Department of Corrections and an additional three years of mandatory supervised release. His conviction was affirmed on direct appeal after which he filed this petition for postconviction relief, which was dismissed following a third-stage evidentiary hearing. The majority affirms that dismissal. For the reasons that follow, I do not agree with that decision and, therefore, respectfully dissent.

¶ 49        Prior to being charged in the criminal case, Jackson retained the services of an Iowa attorney, Eric Puryear, to defend him against the charges. Puryear represented him for the entirety of the case in the trial court. According to Jackson, he paid the attorney between $20,000 and $30,000, at a rate of $300 per hour, but only saw him two to three times prior to trial. Most of his contacts were with Kristen Ohlsen from Puryear's office. Puryear estimated that he billed about 100 hours on the case, apparently confirming Jackson's estimate of what he paid. It is certainly not the largest fee for representation of a criminal defendant; nor is it *de minimus*.

¶ 50    In addition to paying (or securing payment of) fees, Jackson provided his attorney with a list of potential witnesses and summaries of what their testimony might be. Puryear only spoke to one of the people on that list, Lorenzo Walker, prior to trial. "Prior to" in this instance meant talking to Walker in the courtroom only minutes before he gave his trial testimony. The rest of the people on the list, including Spurgetis, he discounted as "character witnesses" because they had not been present for the actual incident and he never spoke with any of them.

¶ 51    Jackson also advised Puryear that it was possible the child's mother had "a history of this type of incident[s]" with DCFS. He also asked Puryear to secure the mother's phone records to verify she was actually at work that day.

¶ 52    It does not appear that Puryear followed up on any of Jackson's information, suggestions, or requests or that they were pursued by anyone in his office. Moreover, it was pure happenstance that he was able to call Walker—if the witness had not decided on his own to attend the trial, he would not have been in court and available to testify. He had not been subpoenaed and was unaware he would be called until he was excluded from the courtroom because he was a witness— a fact that militates against the majority's intimation that his testimony may have been fabricated.

¶ 53    The majority has agreed that Puryear's inaction in these regards is excusable as trial strategy. And that it did not matter anyway because, as far as he knew, all the witnesses could provide was character testimony.

¶ 54    I do not agree for the following reasons. First, Jackson is not a lawyer and he cannot and should not be expected to recognize fully the potential importance or significance of what a witness may know. This ability to gather information and make it part of a coherent defense is one primary reason why people hire counsel. An attorney may well see a pearl where a layman sees only an oyster—but only if he actually looks and does not allow his client's uninformed vision to limit his

own. It may be that all Puryear would have learned, if he had talked with the potential witnesses, was that Jackson was a nice guy. On the other hand, he might have been told that one or more of them had seen Jackson actually interact with K.R.L. in a variety of situations, allowing him to develop a picture of the relationship that existed between them and a narrative that cut against the State's version of what happened.

¶ 55    Of course, it would be preferable to have a positive witness who was present at the very time the child was injured, but a compelling case can be made even without an eyewitness to the incident itself. We are all acutely aware of convictions secured by the State in the absence of any direct physical evidence or eyewitness accounts. They are based on circumstantial evidence and they generally survive challenge. As our Supreme Court noted in *People v. Hall*, 194 Ill. 2d 305 (2000), "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged (citations omitted)."

¶ 56    If such evidence works for the State with its rigorous standard of proof, it should at least be advanced, where available, on behalf of a defendant, who has an opportunity to persuade but no burden. If nothing else, such evidence requires the finder of fact to confront an explanation or a possibility different from or contrary to defendant's guilt.

¶ 57    In addition, while I am in no way proposing that K.R.L.'s mother had anything to do with his injuries, I do suggest that an attorney who fails to follow up on his client's intimation that she might have a prior history of such abuse and may not have been where she said she was at the time the child was injured is not zealously or effectively representing his client. And, if such evidence had been found, it could provide a reasonable argument for why the child would accuse someone other than the actual perpetrator.

¶ 58    It bears repeating that Jackson hired and paid his counsel.  That fact *should* not matter, since the duty of fair and zealous advocacy arises when the attorney agrees to represent the client regardless of the nature of their financial arrangement.

¶ 59    I would find that no strategy erected on the tenuous foundation of a failure to investigate, prior to trial, what potential witnesses might contribute to a client's defense can be found to be legally reasonable or sound.  I would further find that, absent reasonable investigation, any evaluation of whether prejudice occurred would be completely speculative.