NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220251-U

NO. 4-22-0251

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McDonough County |
| JOSEPH SIMPSON, | ) | No. 20CF56 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

_____

JUSTICE BRIDGES delivered the judgment of the court.
Justices DeArmond and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defense counsel was not ineffective for not objecting to hearsay testimony at trial, and his lack of objections did not constitute plain error. Additionally, the trial court did not err in conducting its preliminary *Krankel* inquiry. Therefore, we affirm.

¶ 2     Defendant, Joseph Simpson, appeals his convictions of unlawful restraint (720 ILCS 5/10-3 (West 2020)) and domestic battery (*id.* § 12-3.2(a)(1)) of his then-wife, Rachele Simpson. He argues that he was denied a fair trial when his trial counsel failed to make hearsay objections to testimony that repeated Rachele's out-of-court statement that defendant hit her in the face. In addition, defendant argues that the trial court made an inadequate preliminary *Krankel* inquiry. For the reasons herein, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4     Defendant was charged by information with two counts related to the events of February 24, 2020: count one for unlawful restraint (720 ILCS 5/10-3 (West 2020) (Class 4 felony)) and

count two for domestic battery (*id.* § 12-3.2(a)(1) (West 2020) (Class A misdemeanor)). An amended information was filed on August 19, 2021, which added that, upon conviction of count one, defendant was subject to an extended sentence due to a prior conviction. The case proceeded to a bench trial on October 6, 2021.

¶ 5                                                    A. Trial

¶ 6     Rachele Simpson testified as follows. She married defendant on January 17, 2020, and although they were currently married, they were in the process of getting a divorce. On February 24, 2020, they were living together in Bushnell. She and defendant began drinking that day "[p]robably as soon as [they] woke up." They "always drank." She believed they were drinking Red Stag whiskey, and she did not know when they woke up.

¶ 7     When Rachele and defendant got hungry that afternoon, defendant drove them to Hardee's in Bushnell. He was driving a white Pontiac. On the way, there was "a little bickering." They were not yelling or screaming but instead "picking at each other *** picking and nagging." They were both drunk.

¶ 8     After they arrived at Hardee's and got some food, their bickering escalated. Rachele believed that she must have said something wrong that set defendant off, although she did not know exactly what she said. Defendant hit her in the face with his fist. She believed defendant hit her twice, and when she tried to get out of the car, he pulled her by her shirt back inside. She was trying to get out through the passenger side door. This all occurred in the Hardee's parking lot. She was unsure whether the car was moving when she tried to get out of the car.

¶ 9     Rachele screamed for help when defendant pulled her back into the car. She did not remember if she tried to get out of the car again. Defendant then drove out of the parking lot, and they were screaming and arguing in the car. Defendant continued to hit her as he drove. At some

point, she took the keys out of the ignition and threw them out of the car, and that is when defendant stopped hitting her. She threw the keys when the car was near the police department.

¶ 10   When the car finally stopped, Rachele exited without her shirt because defendant pulled it off her when she was trying to get out of the car again. She ran toward a house. An elderly woman answered the door, let her inside, and gave her a sweatshirt to wear. The woman also called the police. The police arrived quickly and arrested defendant, who had remained in his car after Rachele ran to the house. Rachele described her injuries from that day as a bruised face and a "busted" mouth, with cut gums and bleeding.

¶ 11   Defense counsel asked Rachele about previous testimony she had given in this case. On September 9, 2020, she had testified in favor of lifting a no-contact order between her and defendant. Her testimony that day had denied that defendant had hit her and pulled her back into the car on February 24, 2020. At the time of her September 2020 testimony, she and defendant were still in a relationship. She stated that her September 2020 testimony was not truthful. She explained that she had been untruthful because she did not want to make defendant unhappy—she had been scared and wanted his love.

¶ 12   Rachele had also written the State's Attorney's office asking that the charges against defendant be dropped. She explained she would visit defendant in jail, and he would say he loved her and that she needed to get him out. She wrote the letter at defendant's and his family's behest. The letter was not truthful but instead was written only to get defendant out of jail.

¶ 13   Kesia Lynch testified as follows. She was familiar with defendant but not with Rachele. Defendant was from Bushnell, and "[e]verybody tends to know everybody." She had seen him a few times at the bar, but she had never had any arguments with him. She "honestly [did not] have a problem with [defendant]."

¶ 14    On February 24, 2020, Lynch was at a Dairy Queen drive-through getting food for herself and her kids. The Dairy Queen was in Bushnell across the street from Hardee's. As she was sitting in her car at the drive-through window, she heard a scream, a "blood curdling, scary scream." The scream came from the Hardee's parking lot. She looked toward the lot, and she observed two people fighting inside a beat-up, white car. The car was not moving. A woman was trying to get out of the car, but the driver, a man, was pulling the woman back in by her shirt or hair. Lynch could see that the car door had been flung open and that the woman had partially gotten out before being pulled back in. After the woman was pulled back in, the door was not shut. The car then took off across the road with the door open and was almost hit by another car. Lynch could see that the occupants were "kind of hitting each other. One person was trying to pull away." She never saw the passenger door get shut. She called 9-1-1 after the car passed her and was heading down the road in the direction of the Bushnell police station.

¶ 15    Joanne Dahmm, a retired nurse, testified as follows. On February 24, 2020, she was at her home in Bushnell. Around 4 p.m., she heard a commotion outside and someone screaming for help. She went to her porch and saw a white vehicle with the passenger front door open. A young woman was screaming for help from inside the moving car, and Dahmm yelled stop. Dahmm dialed 9-1-1, but she hung up on the 9-1-1 operator because, after the car stopped, the woman got out and came toward her.

¶ 16    The woman "was crying and she said he had hit her in the face." Dahmm observed that the left side of the woman's face was red. Dahmm took the woman into the house and gave her a sweatshirt because she was wearing only pants and a bra and it was snowing. The man in the car got out of the car and started to walk away until the woman went back out on the porch and yelled

something at him. The 9-1-1 operator redialed her, and Dahmm explained that some sort of domestic dispute had occurred. She then informed the operator that the police had arrived.

¶ 17 Dahmm had not been familiar with Rachele or defendant prior to that day. She identified defendant as the man from the incident on February 24, 2020.

¶ 18 On cross-examination, counsel asked if Rachele was acting hysterical, and Dahmm responded that she "wasn't hysterical but she was upset. She made it well known that he had hit her in the face." Tears were streaming down Rachele's face. She observed red marks only on the left side of her face; she did not see an injury to her lips.

¶ 19 Justin Hood, a Bushnell police officer, testified as follows. On February 24, 2020, Hood was dispatched around 4 p.m. in response to a 9-1-1 call for a "rolling domestic." He located the car, which was a white, four-door Pontiac. Upon his arrival, the car was unoccupied. Defendant was outside of the car, and Rachele was shirtless on the porch of Dahmm's home. By the time he spoke with Rachele, she had received a sweatshirt from Dahmm.

¶ 20 When Hood spoke with Rachele, she was upset and very animated. She kept saying that defendant had done different things to her and was pointing at defendant. Hood observed a bruise on her forehead and on one of her eyes or cheeks. She also had a split lip that looked recent but had stopped bleeding. The cut was on the inside of the lip. He took two photographs of her face, and they were admitted into evidence without objection. After speaking with Rachele, Hood arrested defendant. He did not observe any injuries to defendant.

¶ 21 After the trial court denied defendant's motion for a directed finding, defendant testified as follows. On February 24, 2020, he and Rachele went into town to run errands. They went to the bank, stopped at the gas station, and bought groceries at the Ludlum Food Mart. He believed they

went into town in the afternoon. Their last stop was Hardee's for a bite to eat, and they used the drive-through.

¶ 22    While in town they did not have any arguments; "[e]verything was great." After they arrived at Hardee's, Rachele received some Facebook messages asking that she visit some other people's apartment. Defendant said they could not go because of their dog and the groceries. His response angered Rachele. She "just started yelling" and was also being "a little physical." She was acting hysterical.

¶ 23    Defendant was the one driving the vehicle, a 2006 white Pontiac G6, and he immediately drove away from the Hardee's without getting food at the drive-through. Then Rachele attempted to jump from the vehicle. Defendant estimated they were traveling up to 35 miles per hour. She opened the door and lunged while the car was moving across the intersection from Hardee's. He tried to stop her by pulling her back into the vehicle by her shirt.

¶ 24    After defendant tried pulling Rachele back into the car, she took her shirt off and threw it in the back of the car. At this point she was wearing only a bra on top. They remained in the car until they reached the edge of town just past the police station, which was when Rachele removed the keys from the ignition while he was still driving. Once the car came to a stop, Rachele tried getting out of the car again. She walked up to a residence with a woman on the porch, and defendant left the car to go retrieve the car keys. He was arrested before he made it back to the car, and he cooperated with the officer.

¶ 25    On cross-examination, defendant denied that he and Rachele had been drinking that day, and he denied that they stopped at a liquor store in town. He denied anything physical between him and Rachele that day: he did not hit her, and she did not hit him. He acknowledged that the car door was open when Rachele was trying to get out, but he testified that she immediately shut

the door after he pulled her back into the car, and the door remained shut until the car stopped. However, when Rachele got out of the car to approach Dahmm's house, she left the car door open.

¶ 26    He knew Lynch from around town, but that was the extent of their relationship, and there was no "bad blood" between them. He did not know Dahmm before February 24, 2020.

¶ 27    The trial court began its findings by commenting on witness credibility. It acknowledged the defense's argument that Rachele had credibility issues, noting her previous testimony at the non-contact order hearing and her letter to the State's Attorney. As to defendant, the trial court did not find his explanation of events credible, including that defendant testified to driving home but that the direction he drove toward Dahmm's house was not toward his home.

¶ 28    The trial court continued that it had "two witnesses that don't have any fight in this, any dog in the game" in Lynch and Dahmm. Lynch testified to hearing a loud scream coming from a Hardee's and observed a domestic altercation involving a white Pontiac. Defendant even agreed there was no bad blood between him and Lynch. Dahmm testified that the white car's door was still open when the car approached and that she observed injuries to Rachele's face, consistent with Rachele's statement that defendant hit her. Finally, Officer Hood testified to observing bruising on Rachele's face, and Rachele's injuries were corroborated by the pictures he took, showing red marks on her forehead towards and below the eye. Thus, defendant's testimony that nobody hit anyone that day was contrary to the evidence.

¶ 29    The trial court concluded that Rachele's injuries and the testimony of third-party witnesses rendered her version of events more credible than defendant's. There was "no explanation other than she was battered." Accordingly, the trial court found defendant guilty of both counts beyond a reasonable doubt. It sentenced defendant to four years' imprisonment for the offense of unlawful restraint (720 ILCS 5/10-3 (West 2020)).

¶ 30                    B. Postjudgment Motions and *Krankel* Inquiry

¶ 31    On October 20, 2021, defendant filed a *pro se* "Motion to Appeal," arguing that he received ineffective assistance of trial counsel.

¶ 32    In response to defendant's motion, the trial court held a pre-*Krankel* hearing on October 27, 2021. The trial court examined defendant, who testified that his trial counsel was ineffective in that, during discovery, he received black-and-white photographs of Rachele's face, but counsel failed to object to the color photographs that the State entered into evidence at trial. The trial court found defendant's ineffective assistance claim meritless, and it declined to appoint defendant an attorney to proceed with a *Krankel* hearing. It explained that the color photographs would have been admitted even had trial counsel objected to them.

¶ 33    Through his trial counsel, defendant filed a motion to reconsider or for new trial on November 4, 2021. He argued that the evidence was insufficient to convict and that he did not receive a fair trial because, in part, the defense was not given color photographs of Rachele's injury until trial and had only previously received black-and-white photographs.

¶ 34    On December 1, 2021, defendant filed a *pro se* motion to reconsider judgment or for new trial, which he amended on December 13 to include the story of Samson from the Hebrew Bible's Book of Judges. On December 9, 2021, through his trial counsel, defendant filed a motion to reconsider and reduce sentence, arguing his sentence was excessive. Defendant then filed another *pro se* motion to reconsider or for new trial on January 6, 2022, arguing, *inter alia*, a violation of due process of law, ineffective assistance of counsel, and a *Brady* violation. His *pro se* motion was amended by his trial counsel, arguing insufficiency of the evidence and a *Brady* violation for the State's use of color photographs of Rachele's injuries at trial. On March 2, 2022, the trial court

heard and denied defendant's motions to reconsider judgment or for new trial and to reconsider and reduce his sentence.

¶ 35    This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    Defendant raises two issues on appeal: (1) whether his trial counsel was ineffective for failing to object to Dahmm's testimony, which repeated Rachele's out-of-court statement that defendant hit her in the face, and (2) whether the trial court failed to make an adequate preliminary *Krankel* inquiry.

¶ 38                               A. Hearsay Testimony

¶ 39    Defendant argues that his trial counsel was ineffective for failing to make hearsay objections to Dahmm's testimony on both direct and cross-examination. Specifically, he contends counsel failed to object on direct examination when Dahmm testified that Rachele "was crying and she said [defendant] had hit her in the face," and on cross-examination when Dahmm stated that Rachele "made it well known that [defendant] had hit her in the face." He contends that counsel's failure to object to this testimony could not be considered reasonable trial strategy and that the hearsay evidence was prejudicial because it corroborated Rachele's account of domestic battery and the trial court relied on it in finding defendant guilty.

¶ 40    Defendant continues that no hearsay exception would have applied. In particular, he argues that the excited utterance exception under Illinois Rule of Evidence 803(2) (eff. Sept. 28, 2018) was inapplicable because Rachele was not hysterical at the time, and because she had time and motive to fabricate her statement. He argues that Rachele "may have had upward of ten minutes" to create her story that day. He contrasts Rachele's statement to Dahmm on the day of the alleged

offense with her letter to the State's Attorney's office, in which she wrote of her intent to lie about defendant hurting her.

¶ 41    Defendant acknowledges that the hearsay issue is not preserved for appeal, and he asks that we review the issue for plain error in addition to ineffective assistance of counsel. He argues that, under the first prong of plain error, the evidence was closely balanced.

¶ 42    The State responds that no error for purposes of plain error occurred. It argues that the hearsay statements would have come in as excited utterances under Illinois Rule of Evidence 803(2) (eff. Sept. 28, 2018). It continues that, regardless, the evidence was not closely balanced given that independent witnesses, Lynch and Dahmm, corroborated Rachele's testimony—the former witness observing Rachele and defendant fight in his vehicle and the latter observing redness of Rachele's face consistent with her alleged injury. For the same reasons, the State asserts that defendant did not receive the ineffective assistance of counsel.

¶ 43    We reject defendant's argument. To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14. A defendant must show both (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defendant. *Id.* To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Id.* "[D]efense counsel will not be deemed ineffective for failing to make a futile objection." *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010).

¶ 44    To establish prejudice, the defendant must show that, but for counsel's deficient performance, there was a reasonable probability that the result of the proceeding would have been different. *Bradford*, 2019 IL App (4th) 170148, ¶ 15. A reasonable probability is one that would

undermine confidence in the outcome of the trial. *Id.* A claim of ineffective assistance will fail if the defendant cannot satisfy either prong of the *Strickland* test. *Id.*

¶ 45    Claims of ineffective assistance of counsel may be raised on direct appeal where the basis for the claim can be ascertained from the record. *People v. Schaefer*, 2020 IL App (5th) 180461, ¶ 16. When a claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. The basis for defendant's ineffective assistance claim is clearly ascertained from the record, and he did not raise counsel's failure to object to hearsay below. Therefore, we will review his ineffective assistance claim *de novo*.

¶ 46    Here, regardless of whether trial counsel was deficient for failing to object to the hearsay statements at trial, defendant cannot show prejudice. Although defendant tries to paint this case as a contest of credibility between him and Rachele, that picture unreasonably ignores the three disinterested witnesses who testified consistent with Rachele's allegation that defendant struck her.

¶ 47    Lynch testified to witnessing a man and woman in a white car in the Hardee's parking lot. She heard a scream and saw a man and woman fighting in the car. She then saw a woman try to leave the car, but the man pulled her back in. As the man drove the car away from the Hardee's lot, she again witnessed that the occupants were "kind of hitting each other. One person was trying to pull away."

¶ 48    Dahmm and Hood observed Rachele after she exited defendant's car. Dahmm, a retired nurse, observed red marks on the left-side of Rachele's face. Hood, the responding police officer, observed a bruise on Rachele's forehead and on one of her eyes or cheeks. He also observed that she had a split lip on the inside of the lip.

¶ 49 Given these witnesses' testimonies, the trial court rightly concluded that defendant's claim that he did not hit Rachele was contrary to the evidence. The evidence supported no other reasonable inference than that Rachele was battered, and neither the record nor reason implicated anyone other than defendant as the batterer. Therefore, there was no reasonable probability that the outcome of trial would have been different had counsel objected to the hearsay statements, even if the objections would have been sustained.

¶ 50 Defendant also raises plain error. Plain error review bypasses normal forfeiture principles and allows a reviewing court to consider an unpreserved claim of error when either (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 51 Plain-error review under the closely-balanced-evidence prong of plain error is similar to an ineffective assistance claim based on evidentiary error. *People v. White*, 2011 IL 109689, ¶ 133. Both require that the defendant show they were prejudiced, that is, that the evidence was so closely balanced that the alleged error alone tipped the scales of justice against the defendant or that there was a reasonable probability of a different result absent the error. *Id.* If it is clear that the defendant cannot show prejudice, there is no reason to proceed further with either an ineffective assistance analysis or a plain error review under the closely-balanced-evidence prong; both are evidence-dependent, result-oriented analyses. *Id.* ¶ 134. We have already determined that defendant cannot show prejudice, and as such, his plain error claim fails as well.

¶ 52                           B. Preliminary *Krankel* Inquiry

¶ 53    Defendant also argues that the trial court failed to make an adequate inquiry into his *pro se* claims of ineffective assistance of counsel. He argues that he showed possible neglect of his case when he raised his trial counsel's failure to object to color photographs of Rachele despite receiving only black-and-white photographs before trial. Defendant argues that his only mistake in the trial court was that he suggested exclusion of the photographic evidence instead of first alleging that his counsel should have requested a continuance.

¶ 54    Defendant continues that the difference between the color and black-and-white photographs mattered, in part, because Rachele was wearing dark eye shadow that day, and the eye shadow could have appeared as bruising. He contends that without color photographs, defense counsel did not know whether to question Rachele, Dahmm, or Hood about smudged makeup.

¶ 55    Defendant also argues error in that the trial court failed to address other bases for ineffective assistance, which he had raised in his written *pro se* motion. Those other allegations included trial counsel's failure to question Hood on why he failed to photograph Rachele's split lip. Defendant concludes that the trial court failed to ask follow-up questions that would have allowed it to review the claims' merits, and it failed to create a sufficient record of the factual bases for his claims.

¶ 56    The State responds that Hood observed bruising not only on Rachele's cheek but also on her forehead. The State also addresses one of defendant's assertions in his amended motion to reconsider judgment or for new trial, that he would have presented his brother's testimony had he seen the color photographs before trial. The State contends that if defendant's brother had relevant, exculpatory testimony regarding Rachele's lack of injuries the following day, defendant would have called him regardless of receiving only a black-and-white photograph of Rachele.

¶ 57    Whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33. A preliminary *Krankel* inquiry is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. A *pro se* defendant is not required to file a written motion but need bring only their claim to the trial court's attention. *Roddis*, 2020 IL 124352, ¶ 35. The purpose of a *Krankel* proceeding is to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal. *People v. Patrick*, 2011 IL 111666, ¶ 41; see *People v. Ayres*, 2017 IL 120071, ¶ 21 (explaining that the initial evaluation of a defendant's claims at a preliminary *Krankel* inquiry creates the necessary record for claims raised on appeal).

¶ 58    The trial court should not automatically appoint new counsel when a defendant raises a posttrial claim of ineffective assistance. *Roddis*, 2020 IL 124352, ¶ 35 Instead, the trial court should first examine the factual basis of the defendant's claim, and if it determines that the claim lacks merit or pertains only to matters of trial strategy, it may deny the *pro se* motion and need not appoint new counsel. *Id.* However, if the trial court finds possible neglect of the case, it should appoint new counsel. *Id.*

¶ 59    On review, the operative concern is whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). During the preliminary *Krankel* inquiry, some interchange between the trial court and trial counsel regarding the defendant's claim is permissible. *Jolly*, 2014 IL 117142, ¶ 30. The trial court may also discuss the allegations with the defendant. *Id.* Moreover, the trial court may evaluate the allegations in light of its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *Moore*, 207 Ill. 2d at 79.

¶ 60     Here, the trial court conducted an adequate preliminary *Krankel* inquiry. It examined defendant about his claims in his "Motion to Appeal" that counsel was ineffective. It asked him, "what do you believe [your trial counsel] did in your own words that was ineffective?" Defendant responded that his counsel had received black-and-white photographs of Rachele despite the State submitting color photographs into evidence, and his counsel did not object to this. Defendant asserted that they had "built [his] defense around black-and-white photo evidence." Defendant noted that the evidence reflected bruising on Rachele's right cheek, and he claimed the evidence hurt his credibility and led to the court's determination that "something happened." After defendant finished testifying, the trial court reviewed more of defendant's written motion, noting defendant's allegation that the State used a "sneaky" tactic of altering the photo evidence to black and white before sending it to his trial counsel. The trial court found no basis for such allegation. The trial court concluded that defendant's ineffective assistance claim lacked merit.

¶ 61     The trial court's conclusion was not error. Simply, the color or lack thereof to the photographs had no possible effect on the outcome of defendant's trial. Had there been no photographs at all, the trial court still heard testimony from Dahmm and Hood of observations of Rachele consistent with her being battered on her face. The photographs merely corroborated their testimony, which the trial court had no reason to doubt in the first place, having explained that they were disinterested witnesses unlike defendant and Rachele. Furthermore, Hood's failure to photograph the inside of Rachele's lip was inconsequential. Had he not even testified to Rachele's split lip, the trial court still had sufficient evidence to find that Rachele was battered.

¶ 62     As to defendant's new argument on appeal that Rachele was wearing dark eye shadow, that argument could have been made regardless of the color of the photographs admitted. Nevertheless, such argument strains credulity in light of the totality of the evidence, including when the marks

depicted appear not only on Rachele's cheekbone but also on her forehead. Likewise, defendant's argument in his amended motion to reconsider judgment or for new trial, that he would have called his brother to testify that Rachele's injuries were faked, did not depend upon whether he received color or black-and-white photographs.

¶ 63    In short, three witnesses testified consistent with defendant battering Rachele, corroborating her account and discrediting his. Lynch observed fighting in the car, and Hood and Dahmm observed Rachele's injuries after she exited the car. In light of these testimonies, defendant's case did not turn on the two photographs of Rachele, whether in color or black and white. Accordingly, defendant's *pro se* claim of ineffective assistance lacked merit because he could not show possible neglect of his case, and the trial court did not err in denying his motion and declining to appoint him new counsel.

¶ 64                                    III. CONCLUSION

¶ 65    For the reasons stated, we affirm the judgment of the McDonough County circuit court.

¶ 66    Affirmed.