2024 IL App (4th) 230501

NO. 4-23-0501

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 16, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| MARQUELL EDDIE LONGS, | ) | No. 18CF2948 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Steigmann and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        In March 2022, defendant, Marquell Eddie Longs, was convicted by a jury of

(1) first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) for personally discharging a firearm

that proximately caused the death of Jennifer Jones, (2) attempted first degree murder (*id.* §§ 8-

4(a), 9-1(a)(1)) for personally discharging a firearm that proximately caused great bodily harm to

Tommy Nabors, and (3) unlawful use of a weapon by a felon (*id.* § 24-1.1(a)). On appeal,

defendant argues the trial court abused its discretion when it allowed law enforcement officers to

give lay opinion testimony that identified defendant as the perpetrator of a shooting incident that

was captured on surveillance video. We affirm.

¶ 2                          I. BACKGROUND

¶ 3        On December 19, 2018, defendant and two codefendants were charged in a 41-count indictment for a shooting that caused the death of Jones and injuries to Nabors. Prior to defendant's trial, the codefendants' cases were severed from defendant's case. Defendant was tried before a jury. The incident involved a shooting that occurred on November 11, 2018, at a Citgo gas station in Rockford, Illinois. The gas station was equipped with surveillance cameras and was very busy on the night of the incident. We will only recite the relevant facts for defendant's issues on appeal.

¶ 4                                  A. Pretrial Proceedings

¶ 5        In December 2019, the State filed a motion *in limine*, seeking to permit five police officers to testify regarding various observations made from the surveillance video. A hearing on the State's motion was held in January 2020. At the hearing, Detective Scott St. Vincent testified he worked in the gang unit and had been employed with the Rockford Police Department for 13 years. St. Vincent reviewed the Citgo surveillance video and identified the individual who fired the weapon, who was wearing a dark green hooded sweatshirt and dark-colored pants, as defendant. He described having "in-person contact" with defendant "through the years with [defendant] at least five times." Much of his in-person contact with defendant occurred between 2012 and 2014, including a 2013 investigation involving the shooting death of a friend of defendant. St. Vincent did not recall any in-person contact with defendant after 2014. He was also able to identify Nabors from the surveillance video due to previous police contacts. Nabors was previously charged for his involvement in the shooting investigation from 2013. He stated defendant was an "intended target" of the 2013 shooting.

¶ 6        Following the hearing, the trial court entered a written order granting the State's motion *in limine*, permitting St. Vincent to narrate the surveillance video and offer an opinion as

to the identity of defendant within his knowledge, "subject to the State's ability to lay a proper foundation at trial for [St. Vincent's] testimony and subject to an appropriate limiting instruction on identification issues."

¶ 7        In December 2020, defendant filed a motion to suppress Nabors's identification of defendant. However, in January 2021, the trial court announced that Nabors had been shot and killed and any motions pertaining to his testimony were "nonoperative."

¶ 8        In May 2021, defendant filed a motion seeking to bar St. Vincent's identification of him or, in the alternative, properly instruct the jury about the weight to be given to St. Vincent's testimony. Because defendant had retained new counsel after the January 2020 hearing, the trial court permitted defendant to reopen proofs on the issue of St. Vincent's identification testimony. In July 2021, the State filed an amended motion *in limine*, seeking to permit Detective D'Evyron Boone to provide identification testimony of defendant from the surveillance video.

¶ 9        A hearing was held in August 2021, wherein St. Vincent testified he arrived to work the morning after the shooting incident and was asked to review the Citgo surveillance video. St. Vincent described the Citgo gas station as being "very crowded," yet he was able to identify defendant and "15 to 20" individuals from the video. Similar to his earlier testimony, St. Vincent explained he was familiar with defendant from previous contacts between 2012 to 2014, including a shooting investigation in 2013. He recalled his last in-person contact with defendant was in 2014.

¶ 10        Detective Boone testified that, prior to becoming a detective, he had worked in the housing authority division from November 2017 through June 2020. Boone watched the surveillance video and was able to identify defendant as the individual wearing a "green hoodie

- 3 -

or jacket." Boone stated he immediately recognized defendant from the video. Boone recalled interacting with defendant in person "within two weeks" of the shooting during a "non-essential stop" at the "West Side Stop" parking lot. During his time with the housing authority, he also interacted with defendant "once or twice." Boone recalled interacting in person with defendant "four or five" times. Boone also recalled seeing defendant's photograph during "daily summaries" for active warrants and Crimestoppers.

¶ 11    The trial court entered a written order granting the State's motion *in limine* to permit St. Vincent and Boone to provide identification testimony of defendant. The court's order also indicated a limiting instruction, pursuant to *People v. Thompson*, 2016 IL 118667, would be provided to the jury.

¶ 12                                B. Jury Trial

¶ 13    The matter proceeded to a jury trial in March 2022. Among the admitted evidence was an exhibit that compiled video of the alleged perpetrator of the shooting.

¶ 14                                1. *Surveillance Video*

¶ 15    The video itself is 9 minutes and 48 seconds long. It is time-stamped as occurring on Sunday, November 11, 2018, beginning at 1:51 a.m. It began with a white vehicle arriving at a side parking lot of the gas station. A black male wearing a green hooded sweatshirt and a backward-worn black baseball cap exited the passenger seat of the vehicle. The camera view changed throughout the video, following the movements of this individual.

¶ 16    In front of the gas station were several vehicles near the fuel pumps and several individuals outside engaging with occupants of the various vehicles. Inside the gas station was a small congregation of people near the cashier counter. The individual entered the gas station, walked toward the back area of the gas station, and then exited back to the parking lot. The

individual engaged with someone in a parked vehicle and appeared to receive something from a backseat passenger, which he then put into his pants. He then proceeded to stand behind the white vehicle in which he had arrived and urinated on the ground of the parking lot. The individual walked back into the gas station, where there was a larger group of people near the cashier counter. He immediately left the gas station, engaged with a few individuals near the fuel pumps, took a drink from a bottle given to him, and then walked toward the opposite side of the gas station while turning the bill of his hat toward the front of his head.

¶ 17 He again returned to the front of the gas station and headed back inside, where he engaged briefly with a woman in one of the store's aisles. He again exited the gas station and headed toward the parking lot on the opposite side of the building. A camera view from this side of the gas station showed roughly 25 vehicles, many running and with their headlights on. The individual walked toward a light-colored vehicle on the passenger side and fired several gunshots into the vehicle. The shooter immediately walked away. The driver of the vehicle exited before the camera angle changed to show the shooter running across the front of the store to the parking lot toward the other side from where he initially arrived. The shooter got into the back passenger-side seat of a black vehicle, which then left the gas station.

¶ 18                    2. *Testimony of Officer Roser*

¶ 19 Rockford Police Department officer Corey Roser testified he was on patrol the night of the incident and arrived at the gas station. He estimated more than 100 people were at the gas station and more than 50 vehicles were in the parking lot. Roser attempted to help both Jones and Nabors, who had been shot.

¶ 20                    3. *Testimony of Detective Boone*

¶ 21 Boone testified he had worked for the Rockford Police Department for over 13 years. Following the shooting, he was directed to report to the "District 2" conference room, along with other officers, to watch surveillance video from the gas station and identify subjects in the video. Boone was able to observe the shooting from the video and identified the shooter as wearing a "black hat and green hoodie." Boone observed the same individual in the gas station from multiple angles of the surveillance video. He identified the individual wearing the black hat and green hooded sweatshirt as defendant. Boone stated he had no doubt the individual was defendant and recalled interacting with defendant "a couple of weeks" prior at the West Side Stop. He stated defendant's appearance from a couple of weeks prior to the shooting had not changed. Boone stated he had watched both the raw surveillance video and a compilation video showing the shooter's movements inside and outside the gas station. He also reviewed still photos taken from the surveillance video.

¶ 22 On cross-examination, Boone stated he was aware that in 2013 Nabors had been previously identified as involved in a murder investigation, the victim of which was someone defendant had known. However, he denied this information was relevant to his identification of defendant from the surveillance video. On redirect examination, he stated he was never personally involved in the 2013 investigation involving Nabors. He also stated defendant's face was not always facing the camera but was visible from certain angles and that no one else in the video was wearing clothing similar to what defendant was wearing.

¶ 23 Following Boone's testimony, the trial court instructed the jury as follows:

"[B]efore we move on to the next witness in this case, I have an obligation to

instruct you that you now have before you evidence that a law enforcement

officer has made an identification of the defendant and other individuals from a

video recording. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

¶ 24                              4. *Testimony of Detective St. Vincent*

¶ 25          St. Vincent also testified he responded to District 2 to review surveillance video. St. Vincent described the video as "very clear" and said his objective was to identify as many people in the video as he could. He noted the individual who committed the shooting was wearing a "green hoodie and black baseball cap." He recognized the individual as defendant. He last had in-person contact with defendant in 2014. He noted five prior contacts with defendant, including an investigation in 2013 involving the shooting death of defendant's friend. Nabors, whom St. Vincent also recognized from the video, had been charged in the shooting death of defendant's friend. St. Vincent visited Nabors in the hospital after the shooting. He informed the jury that Nabors had died prior to defendant's trial "from injuries unrelated to the injuries he sustained in the November 11, 2018, incident." St. Vincent described still photographs and a compilation video of the shooter's movement from the night of the incident. He also recalled viewing images of defendant on social media a few months prior to the shooting. Following St. Vincent's testimony, the trial court gave the same limiting instruction. We note this limiting instruction was given to the jury again as part of the written jury instructions.

¶ 26          The parties stipulated to defendant having a prior, unspecified, felony conviction. The State rested. Defendant did not present any evidence. The jury found defendant guilty of (1) the first degree murder of Jones for personally discharging a firearm that proximately caused

- 7 -

her death, (2) the attempted first degree murder of Nabors for personally discharging a firearm that proximately caused great bodily harm, and (3) unlawful use of a weapon by a felon.

¶ 27                                    C. Posttrial Proceedings

¶ 28        Following the jury's verdict, defendant, through counsel, filed a motion for a new trial. Defendant himself also filed *pro se* motions for a new trial and alleged ineffective assistance of counsel. The trial court appointed the public defender for his ineffective-assistance claims. Defendant's appointed counsel then filed an amended motion for a new trial, arguing defendant's trial counsel had failed to challenge Boone's and St. Vincent's identification of defendant. The amended motion also alleged counsel had failed to call witnesses to rebut the detectives' testimony about their familiarity with him. In October 2022, the court denied defendant's amended motion for a new trial.

¶ 29        Defendant filed a subsequent *pro se* motion, claiming the trial judge was biased. The *pro se* motion was heard before a different judge and was denied. Defendant's *pro se* motion to reconsider was also denied.

¶ 30        Defendant's appointed counsel filed a second amended motion for a new trial in February 2023, arguing the trial court erred when allowing detectives to identify defendant from the surveillance video and that their identification testimony was not helpful to the jury. The court denied defendant's second amended motion for a new trial.

¶ 31        The matter proceeded to sentencing in May 2023. Defendant was sentenced to 60 years in prison for first degree murder, 40 years for attempted first degree murder, and 2 years for unlawful use of a weapon by a felon. The sentences were ordered to be served consecutively, for an aggregate 102 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 32    This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34    On appeal, defendant argues the trial court abused its discretion when it permitted Detectives Boone and St. Vincent to offer lay opinion testimony identifying him as the perpetrator of the shooting from the surveillance video. Specifically, defendant contends that the video was very high quality, the jury was able to observe him seated at counsel's table in a well-lit courtroom over the three-day trial, and no evidence showed the perpetrator disguised himself or that defendant's appearance had significantly changed. In support of his claim, defendant cites *Thompson*, 2016 IL 118667.

¶ 35    In *Thompson*, our supreme court addressed the admissibility of lay opinion identification testimony and whether a law enforcement officer may provide such testimony under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). *Thompson*, 2016 IL 118667, ¶ 40.. The *Thompson* court developed "precautionary procedures," establishing "that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the [trial] court should afford the defendant an opportunity to examine the officer outside the presence of the jury" to "explore" the officer's familiarity with the defendant, "as well as any bias or prejudice." *Id.* ¶ 59. Furthermore, the trial court

> "should properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer." *Id.*

¶ 36         Additionally, the *Thompson* court adopted a totality-of-the-circumstances approach to determine whether a law enforcement officer's lay opinion identification testimony would be helpful to the jury and identified five factors:

> "[(1)] the witness's general familiarity with the defendant; [(2)] the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; [(3)] whether the defendant was disguised in the recording or [(4)] changed his/her appearance between the time of the recording and trial; and [(5)] the clarity of the recording and extent to which the individual is depicted." *Id.* ¶ 51.

¶ 37         The absence of any particular factor does not render the witness's opinion testimony inadmissible. *Id.* Rather, "a lay witness need only have sufficient contact with the defendant, which the jury would not possess, to achieve a level of familiarity that renders the lay opinion helpful." *Id.* ¶ 42. As such, the extent of a witness's prior familiarity with the defendant is a matter of weight rather than admissibility. *Id.* ¶ 49. We review the trial court's decision to admit lay opinion identification testimony for an abuse of discretion. *Id.*

¶ 38         When addressing the factors from *Thompson* for determining whether an officer's lay opinion identification testimony would be helpful to the jury, defendant concedes Detectives Boone and St. Vincent sufficiently established the first factor that both had a general familiarity with him that the jury did not possess.

¶ 39         Regarding the second factor, defendant notes both Boone and St. Vincent had testified they observed him shortly before the night of the shooting. Boone stated he had in-person contact approximately two weeks prior to the shooting, and St. Vincent stated he had

viewed images of him via social media a few months prior to the shooting. However, neither provided details about defendant's appearance in those prior encounters nor described him as being dressed in a similar manner to the individual observed in the surveillance video. The State argues both detectives indicated defendant's appearance had not greatly changed since they last observed him prior to the shooting.

¶ 40 Regarding the third and fourth factors, defendant argues there was no evidence from the surveillance video the shooter sought to disguise himself or otherwise conceal his identity, nor did defendant alter his appearance between the shooting and his trial. The State concedes the suspected shooter from the surveillance video did not disguise himself. However, the State notes the suspected shooter appeared to have braids under his hat, whereas defendant's hair length changed in various photographs of defendant that were admitted into evidence. Furthermore, the record does not establish defendant's appearance at trial. The State also contends the record suggests defendant wore a mask during some portions of the trial in accordance with COVID-19 safety protocols.

¶ 41 Regarding the fifth factor, defendant argues the high-quality surveillance video, combined with a lack of evidence defendant disguised himself or changed his appearance prior to trial, provides little basis for concluding Detectives Boone and St. Vincent were in a superior position to the jury in identifying him. Furthermore, defendant argues the testimony of law enforcement officers, as authority figures, carries additional weight in the eyes of the jury and that permitting the detectives to identify defendant on repeated occasions usurped the jury's function to factually conclude for themselves whether the shooter was, in fact, defendant. See, *e.g.*, *People v. Crump*, 319 Ill. App. 3d 538, 544 (2001) (finding a police officer's testimony that he believed the defendant was guilty "was especially prejudicial because, as an authority figure,

he was informing the jury that it should believe a portion of the prosecution's case"). Thus, defendant contends the detectives' testimonies provided minimal probative value that was outweighed by the risk of unfair prejudice, thereby amounting to an abuse of discretion by the trial court when it permitted their testimonies. The State concedes the jury did not need the detectives' identification testimony to compensate for the surveillance video's image quality.

¶ 42    We are unpersuaded by defendant's arguments. See *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 44 ("[D]efendant, as the appellant, bears the burden of persuasion as to *** claims of error."). Certainly, the quality of the surveillance video, the fact the shooter did not appear to conceal his identity, and the absence of record evidence suggesting defendant substantially altered his appearance prior to trial favor defendant's arguments. However, we are reviewing the trial court's decision to permit Detectives Boone and St. Vincent to provide lay opinion identification testimony under the totality of circumstances. As the *Thompson* court noted, if one or more of the factors are present, then there is a basis to conclude the witness is in a superior position to the jury to identify the defendant from the video or photographic evidence. *Thompson*, 2016 IL 118667, ¶ 49.

¶ 43    Here, both detectives provided sufficient testimony to establish a general familiarity with defendant. This alone rendered their opinions helpful to the jury. See *id.* ¶ 50 ("[T]he witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful."). Additionally, Boone had made in-person contact with defendant just a couple of weeks prior to the shooting, and St. Vincent had seen pictures of defendant a few months prior to the shooting while monitoring his social media. Having reviewed the video, we agree the surveillance video is high quality; however, the frames do not fluidly transition, resulting in a choppy video. The shooter's face can

be seen on a few occasions but is not readily observable unless the viewers know who they should be observing. Therefore, we find under the totality of circumstances the factors do not support an abuse of discretion.

¶ 44   Defendant further contends the detectives' testimonies as law enforcement officers were more prejudicial than probative due to the high-quality video, lack of disguise by the shooter, and defendant's unchanged appearance at trial. However, the *Thompson* court established precautionary procedures to "safeguard a defendant's rights." *Id.* ¶ 59. These precautionary procedures included (1) allowing a defendant to examine the testifying officer outside the presence of the jury to establish the officer's familiarity with the defendant and (2) properly instructing the jury that it (a) need not give any weight to the officer's testimony and (b) is not to draw any adverse inference from the fact that the witness is a law enforcement officer. *Id.* These precautionary procedures were sufficiently satisfied in this case when defendant was able to cross-examine Boone and St. Vincent at the pretrial hearings. The trial court instructed the jurors twice that it was their duty to determine the weight to be given to the detectives' testimonies and to not draw any inferences from the fact they were law enforcement officers. That is, the detectives' testimonies were an issue of weight afforded rather than admissibility. *Id.* ¶ 49. Additionally, unlike in *Crump*, neither Boone nor St. Vincent ever opined their belief as to defendant's guilt. Rather, both established their familiarity with defendant and then made an identification of defendant from the surveillance video based on their individual familiarity with him.

¶ 45   A trial court abuses its discretion when its ruling is fanciful, unreasonable, or when no reasonable person would adopt its view. *People v. Taylor*, 2011 IL 110067, ¶ 27. Here, the court found the detectives' testimonies would aid the jury, and based on the *Thompson*

factors and precautionary procedures implemented at defendant's trial, the court acted reasonably when admitting the testimony of Detectives Boone and St. Vincent. Therefore, we find the court did not abuse its discretion when admitting the lay opinion identification testimony of the detectives.

¶ 46                               III. CONCLUSION

¶ 47          For the reasons stated, we affirm the trial court's judgment.

¶ 48          Affirmed.

***People v. Longs*, 2024 IL App (4th) 230501**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 18-CF-2948; the Hon. Brendan A. Maher, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |