NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231139-U

NO. 4-23-1139

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 29, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| DEMARO L. BROWNLEE, | ) | No. 22CF536 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rudolph M. Braud, |
| | ) | Judge Presiding. |

---

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1  *Held*: The appellate court affirmed, finding (1) the record on direct appeal is insufficient to determine whether trial counsel was ineffective for failing to impeach a witness with his prior inconsistent statement, (2) trial counsel was not ineffective for failing to object to a detective's lay opinion identification testimony, and (3) defendant failed to establish cumulative error.

¶ 2  Following a jury trial in April 2023, defendant, Demaro L. Brownlee, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)). In July 2023, the trial court sentenced defendant to 55 years in prison. Defendant appeals, arguing defense counsel was ineffective for failing to (1) impeach a witness with his prior inconsistent statement and (2) object to a detective's lay opinion testimony identifying defendant in a surveillance video. Alternatively, defendant argues if each ineffective assistance claim is not sufficient on its own, the cumulative effect of his counsel's errors deprived him of a fair trial. We disagree and affirm.

¶ 3                                        I. BACKGROUND

¶ 4        In June 2022, the State charged defendant by information with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2022)), one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2022)), one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2022)), and two counts of unlawful possession of a weapon by a felon (720 5/24-1.1(a) (West 2022)) for his alleged involvement in the May 2022 shooting death of Jayvon Watson. The charges alleged defendant personally discharged the firearm involved in the shooting. A grand jury later indicted defendant on the same charges.

¶ 5                                A. Jury Trial

¶ 6        A three-day jury trial commenced in April 2023, during which the jury heard the following evidence. The shooting occurred near Seven Brothers Grocery located in Springfield, Illinois. The store is at the corner of East Laurel Street and South 11th Street, with the front of the store facing north on Laurel Street. Immediately to the west of the store on Laurel Street is a Central Management Services (CMS) building within a fenced lot owned by the State of Illinois. Farther west of the CMS lot is a viaduct carrying railroad tracks over Laurel Street.

¶ 7                                1. *Benjamin Baker*

¶ 8        Benjamin Baker testified in the late afternoon of May 24, 2022, Terrence Washington and defendant came to his house. He knew Washington and defendant because they all attended the same high school. Baker stated defendant went by the nickname "Mo." He recalled defendant was wearing white Nike Air Force 1 shoes, a white shirt, a black leather jacket hanging over his shoulder, and a gun on his hip. He further recalled Washington was wearing blue jeans with holes in the knees, a black shirt, and red Nike Air Max shoes. He described defendant as "short" and around "5'5," and Washington as "5'9."

¶ 9        When asked to identify defendant in court, Baker stated he could not see because he was not wearing his glasses. He further declined to leave the witness stand to try and make an identification.

¶ 10                        2. *Terrence Washington*

¶ 11        Washington testified he had been friends with defendant, whom he called "Mo," for several years. He was also friends with Watson, whose nickname was "Sosa." Washington stated Watson owed him money and cannabis for cutting his lawn. Prior to the shooting, Washington sent Watson a voicemail and text messages about the payment. When asked to make an in-court identification of defendant, Washington claimed he did not see defendant in the courtroom.

¶ 12        The day of the shooting, Washington and defendant went to Seven Brothers Grocery. Washington went into the store first, while defendant waited outside for a short time before going into the store. Washington recalled defendant was wearing a brown leather coat, a mask, and a white t-shirt and described him as "short." While inside the store, Washington saw "two other kids" whom he did not recognize, but he spoke with them briefly.

¶ 13        All four individuals left Seven Brothers Grocery, with the two people from the store walking ahead of Washington and defendant. As they were walking away, Watson drove up in his vehicle and parked on the sidewalk next to Washington and defendant. Watson exited the vehicle and tried to speak with Washington about the money he owed. During the conversation, defendant tried passing a gun to Washington. Washington described the exchange as follows:

> "[Defendant] handed [the gun] to me and then I couldn't do it. I got to shaking. He
>
> took it back. I looked at him to stop before everything went wrong. He fired the gun

off and it was too late to save [Watson] and [defendant]. I tried to save both of them the same day."

¶ 14    Washington testified defendant fired five shots in total, hitting Watson three times in his chest and two times in his back. After the shooting, he and defendant "hopped the fence" and ran from the scene. Washington took the gun from defendant and put it in his basement. The gun was later recovered during a search of Washington's home. Testing revealed no suitable fingerprints or DNA on the gun.

¶ 15    Defense counsel did not cross-examine Washington.

¶ 16                              3. *Terrance Wallace*

¶ 17    Terrance Wallace testified he was with Watson and Ricky Webb on the day of the shooting. After Watson received a phone call, he drove the group to Seven Brothers Grocery. The group drove under the viaduct on Laurel Street towards Seven Brothers Grocery. Wallace recalled seeing a group of four men walking towards the viaduct. He recognized one of the men as Washington, who was not wearing a mask. Wallace stated he had known Washington for a couple years, as they had attended the same school. According to Wallace, the other three men were wearing masks, including a short man with a black ski mask. In his recorded police interview, Wallace described the shooter as wearing a black mask and " 'a jacket wrapped around his body.' " He also described the shooter as short and young, likely in his teens or twenties.

¶ 18    Watson parked his vehicle and went up to Washington and began speaking with him. Wallace and Webb remained in the vehicle. Wallace testified he initially saw the gun in Washington's hand, who later passed the gun to one of the masked individuals. However, after being confronted with his recorded police interview, Wallace remembered telling officers that the

- 4 -

masked individual tried giving the gun to Washington, who passed it back to the masked individual before the shooting. Wallace stated the masked individual was the one who fired the shots.

¶ 19 After the shooting, Wallace observed the group run towards the viaduct on Laurel Street. Wallace drove Watson to the hospital, where he later died of multiple gunshot wounds.

¶ 20                              4. *Ricky Webb*

¶ 21 Webb testified that on the day of the shooting he, Watson, and Wallace were driving around in Watson's vehicle. Webb recalled telling officers that he saw four people standing outside Seven Brothers Grocery. He initially testified he did not see the shooter.

¶ 22 Webb participated in two recorded police interviews the day of the shooting—one outside the hospital shortly after the shooting and another with detectives several hours later. When confronted with his recorded statements from the hospital, Webb agreed he told officers that " 'the dude that confronted [Watson] was mowing his lawn basically and [Watson] paid him $25 already and he wanted more for it and he had a little dude with him and he just started shooting.' " However, Webb continued to deny that he saw the shooter.

¶ 23 The State then confronted Webb with his second interview, where he told detectives, " 'The dude I guess [Watson] was having a conversation with and I seen a little dude next to him and the dude [Watson] was talking to wasn't the shooter. It was the little dude who he had with him.' " Thereafter, Webb admitted to making the statements. Also during the second interview, Webb stated the shooter was " 'like 5'4, something like that' " but he did not know the shooter's identity as it was someone he had never seen before. Webb testified that the four people ran towards the viaduct on Laurel Street after the shooting.

¶ 24        On cross-examination, Webb testified he gave a third police interview on May 25, 2022. During that interview, Webb recalled telling detectives, " 'I can't tell you who the shooter was' " and that he could not identify anyone involved because he did not see them.

¶ 25                                5. *Aareon Cutler*

¶ 26        Aareon Cutler testified he and Martiece McClain went to Seven Brothers Grocery on the day of the shooting. Cutler spoke with a couple people in the store, including an acquaintance he last saw around eight to nine years ago at the Boys and Girls Club. In his recorded police interview, Cutler told officers the individual's name began with an "M." Cutler testified "M" was wearing a bright shirt, a dark colored jacket over his shoulders, and a weapon on his hip. In the interview, Cutler stated the individual was wearing blue jeans, a white shirt, a leather jacket over his shoulder, and a gun on his hip.

¶ 27        Soon thereafter, Cutler and McClain exited the store together. When they were leaving, Cutler saw Watson's car drive towards Seven Brothers Grocery and park there. Cutler observed only Watson getting out of the vehicle. He initially denied seeing the shooting or the gun. However, during his recorded police interview, Cutler told officers, " '[D]ude instantly tries to pass the dude that was actually beefing with the gun.' " In the same interview, Cutler stated "the guy with the coat over his shoulder" tried to pass the gun, but the other person would not take it. He further identified "the Boys and Girls Club kid" as the person with the gun. After being confronted with his statements, Cutler admitted, "I remember saying that he tried passing the gun, but I don't remember all that extra stuff."

¶ 28        As Cutler and McClain were walking towards the viaduct on Laurel Street, Cutler heard around three to four shots. After hearing the shots, he and McClain ran across the viaduct to get away from the shooting.

¶ 29                                   6. *Martiece McClain*

¶ 30          McClain initially testified he was alone and walking away from Seven Brothers Grocery when he heard the shooting. He claimed he could not recall how many shots he heard or what the shooter looked like. However, in his recorded police interview, McClain told officers that he was with Cutler inside Seven Brothers Grocery when two black males entered. The shorter of the two males was wearing a mask and had his hands in his pockets. McClain told officers he heard three to six shots fired as he was walking away from the store. He also told officers that an individual named "Sosa" was involved in the dispute.

¶ 31                                   7. *Detective John Larson*

¶ 32          John Larson, a detective with the Springfield Police Department, testified he was the lead investigator in this case. The day of the shooting, responding officers at the scene found a spent .22-caliber cartridge case between the CMS lot fence and Laurel Street and an empty .22-caliber magazine in the rocks along the railroad tracks. Testing of the magazine revealed no suitable fingerprints or DNA. The day after the shooting, officers located two additional spent .22-caliber cartridge cases within the fence on the CMS lot. Later testing revealed the spent cartridge cases recovered at the scene were fired from the gun found in Washington's home.

¶ 33          Detective Larson testified a phone extraction was performed on Watson's and Washington's cell phones. The day of the shooting, Washington left two voicemails on Watson's phone demanding that Watson pay him for cutting his lawn. Immediately thereafter, Watson texted Washington's phone: "I will beat yo a*** if you text me sum dumb s*** again bro." Washington responded: "Hello how are you mad at me cuz I'm texting you about my s*** legal make some sense you going to beat my a*** because I'm texting you about my s*** that you owe say less."

¶ 34    The remaining incoming and outgoing calls on Washington's phone the day of the shooting were as follows. Washington called defendant six times between 9:00 a.m. and 12:30 p.m. Defendant called Washington back at 12:33 p.m. Washington then called Watson's phone at 4:36 p.m. and 6:42 p.m. The shooting occurred around 6:46 p.m. About 10 minutes after the shooting, defendant called Washington's phone and the two exchanged four more phone calls shortly thereafter.

¶ 35    During the investigation, officers reviewed surveillance video from Seven Brothers Grocery and the CMS building. Still photographs were taken of the individuals walking through the front door of Seven Brothers Grocery. When shown the images, Detective Larson identified the individuals as Washington, Cutler, McClain, and the suspected shooter. The suspected shooter was wearing a black balaclava over his head and face, a white t-shirt, a black jacket over his right shoulder, white shoes, and a gun on his hip. The suspected shooter briefly lowered his mask, allowing officers to take still photographs of the right side of his face. The surveillance video from the CMS building showed an individual in a white T-shirt falling in the same place where officers later recovered the empty magazine.

¶ 36    Defendant's cell phone data was also obtained during the investigation. Detective Larson testified the location data from defendant's phone placed him by Baker's residence about an hour and a half before the shooting. Defendant's phone was near Seven Brothers Grocery around 10 to 15 minutes before the shooting and at the time of the shooting. The day after the shooting, defendant's phone indicated he traveled from Springfield to St. Louis via an Amtrak train. Amtrak records showed someone purchased an Amtrak ticket for the same route in defendant's name.

¶ 37        Defendant was arrested on May 31, 2022, in East St. Louis, Illinois. After the arrest, Detective Larson questioned defendant for approximately an hour and observed defendant's physical appearance during the interview. Based on his observations, Larson found defendant's facial features matched those of the suspected shooter captured on the surveillance video from Seven Brothers Grocery. Detective Larson made an in-court identification of defendant and defense counsel did not object to the identification.

¶ 38        On redirect examination, Detective Larson stated during his recorded police interview Washington identified defendant as the shooter. Washington also gave the nickname "T Motor." When asked, Detective Larson specified Washington also gave him the nickname "Mo."

¶ 39                              B. Jury Verdict and Sentence

¶ 40        The jury found defendant guilty of first degree murder and additionally found he personally discharged a firearm that proximately caused Watson's death. The trial court sentenced defendant to 55 years in prison.

¶ 41        This appeal followed.

¶ 42                              II. ANALYSIS

¶ 43        Defendant argues his trial counsel provided ineffective assistance by (1) failing to confront a witness with a prior inconsistent statement and (2) failing to object to a detective giving lay opinion identification testimony. He alternatively argues that, if each ineffective assistance claim is not sufficient on its own, the cumulative effect of his counsel's errors deprived him of a fair trial. We disagree.

¶ 44        A. Compliance with Illinois Supreme Court Rule 341 (eff. Oct.1, 2020)

¶ 45        We first address the State's contention that defendant's brief does not comply with Rule 341(h)(6).

¶ 46　　　　　Rule 341(h) sets forth the rules governing the contents and requirements for an appellant's brief. Rule 341(h)(6) states an appellant's brief "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Compliance with Rule 341(h) is not a mere suggestion, and it is within this court's discretion to strike an appellant's brief and dismiss the appeal entirely for failing to comply with Rule 341(h). *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). However, "we will not strike a party's statement of facts unless it includes such flagrant improprieties that it hinders our review of the issues." *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009).

¶ 47　　　　　Although the State is correct defendant inaccurately portrayed or omitted certain evidence from his statement of facts, we find the violations are not so flagrant as to preclude review of his appeal. Thus, we will consider defendant's brief to the extent it accurately states the facts of the case, and otherwise disregard the noncompliant portions of his brief.

¶ 48　　　　　　　　　　B. Ineffective Assistance of Counsel

¶ 49　　　　　　　　　　1. *Prior Inconsistent Statement*

¶ 50　　　　　Defendant argues his attorney provided ineffective assistance of counsel by failing to impeach Washington with his prior inconsistent statement made during a recorded police interview. He alleges Washington initially identified an individual named "T Motor" as the shooter and only later identified defendant. The State disagrees and argues that Washington's statement was not a prior inconsistent statement, as "T Motor" was actually another nickname used by defendant.

¶ 51　　　　　The United States and Illinois constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A

defendant's claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14. A defendant generally must raise an ineffective assistance claim on direct appeal or risk forfeiting the claim. *People v. Veach*, 2017 IL 120649, ¶ 47. However, "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649, ¶ 46. Procedural default does not preclude a defendant from raising a claim on collateral review that depends on facts not found in the record. *Veach*, 2017 IL 120649, ¶ 47.

¶ 52         Here, the record is inadequate to resolve this claim on direct review. Neither Washington's recorded police interview nor a transcript of his interview are a part of the record. While the record shows defense counsel had a copy of Washington's interview, counsel did not use the interview at trial. The record is also silent as to counsel's reasons for deciding not to use Washington's statements for impeachment or as substantive evidence. The only reference at trial to "T Motor" was during the State's redirect examination of Detective Larson. The State purports to rely on a police report summarizing Washington's interview, yet its brief cites to the presentence investigation report, which was not created until after the trial. See *John Crane Inc.*, 391 Ill. App. 3d at 698 (directing reviewing courts to disregard any inappropriate or unsupported statements in a party's rendition of the facts). Thus, we would be forced to speculate as to whether Washington's prior statements were truly inconsistent or whether the statements would have helped or hurt defendant's case.

¶ 53    Accordingly, we decline to address defendant's claim of ineffective assistance of counsel on direct review and note he may raise this claim in a postconviction proceeding where he can develop a complete record for our review. See *People v. McGath*, 2017 IL App (4th) 150608, ¶ 43.

¶ 54                    2. *Lay Opinion Identification Testimony*

¶ 55    Defendant also argues he was denied the effective assistance of counsel when his attorney failed to object to Detective Larson's lay opinion testimony identifying defendant in the surveillance video.

¶ 56    As discussed above, we analyze claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland*. *Albanese*, 104 Ill. 2d at 526-27. To establish deficient performance, a defendant must show his attorney's performance fell below an objective standard of reasonableness. *Bradford*, 2019 IL App (4th) 170148, ¶ 14. A mistake in trial strategy or an error in judgment by trial counsel is not sufficient to establish deficient performance. *People v. Peterson*, 2017 IL 120331, ¶ 80. Rather, "a defendant must show his counsel's representation undermined the proper functioning of the adversarial process to such an extent that the defendant was denied a fair trial." *People v. Pope*, 2020 IL App (4th) 180773, ¶ 62. Reviewing courts are highly deferential when scrutinizing counsel's performance, and as such, the defendant must overcome the strong presumption that counsel's actions constituted sound trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 319-20 (1997).

¶ 57    To establish prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" has been defined as a probability sufficient to undermine confidence

- 12 -

in the outcome of the trial. *Peterson*, 2017 IL 120331, ¶ 79. "Where, as here, a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *People v. Johnson*, 2021 IL 126291, ¶ 54.

¶ 58        "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35. We review *de novo* whether a defendant was denied the effective assistance of counsel. *Johnson*, 2021 IL 126291, ¶ 52.

¶ 59        Defendant claims he received ineffective assistance of counsel when his attorney failed to object to Detective Larson's lay opinion identification testimony. Our supreme court addressed the admissibility of lay opinion identification testimony in *People v. Thompson*, 2016 IL 118667. Lay opinion identification testimony is admissible where "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Thompson*, 2016 IL 118667, ¶ 50 (citing Ill. R. Evid. 701 (eff. Jan. 1, 2011)). In the context of identification from a surveillance video, the court found,

> "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Thompson*, 2016 IL 118667, ¶ 50.

¶ 60    To determine whether a witness's lay opinion identification testimony is helpful, the court weighs the following factors under a totality-of-the-circumstances approach:

"[(1)] the witness's general familiarity with the defendant; [(2)] the [witness's] familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; [(3)] whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and [(4)] the clarity of the recording and extent to which the individual is depicted." *Thompson*, 2016 IL 118667, ¶ 51.

The existence of any one factor is enough to indicate "that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Internal quotation marks omitted.) *Thompson*, 2016 IL 118667, ¶ 49. Likewise, "the absence of any particular factor does not render the testimony inadmissible." *Thompson*, 2016 IL 118667, ¶ 51. "[T]he extent of a witness's prior familiarity with the defendant is a matter of weight rather than admissibility." *People v. Longs*, 2024 IL App (4th) 230501, ¶ 37.

¶ 61    When the lay opinion identification testimony is offered by a law enforcement officer, the trial court must follow additional "precautionary procedures" prior to admitting the testimony. *Longs*, 2024 IL App (4th) 230501, ¶ 35. First, "the *** court should afford the defendant an opportunity to examine the officer outside the presence of the jury." *Thompson*, 2016 IL 118667, ¶ 59. "This will provide the defendant with an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice." *Thompson*, 2016 IL 118667, ¶ 59. Second, the court "should properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any

adverse inference from the fact the witness is a law enforcement officer." *Thompson*, 2016 IL 118667, ¶ 59.

¶ 62 Defendant has failed to demonstrate deficient performance under the first *Strickland* prong. Even if defense counsel objected to Detective Larson's identification of defendant, there was no basis for the trial court to exclude his testimony. See *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24 ("[C]ounsel cannot be ineffective for failing to object if there was no error to object to."). As discussed above, if one or more of the *Thompson* factors are present, then the court may properly conclude the witness is in a better position than the jury to identify the defendant from the surveillance video. *Thompson*, 2016 IL 118667, ¶ 49. At trial, Detective Larson provided sufficient testimony to establish a general familiarity with defendant under the first *Thompson* factor. Approximately a week after the shooting, Detective Larson interviewed defendant in-person. Accordingly, he was within a few feet of defendant for about an hour. This gave Detective Larson enough familiarity with defendant to put him in a better position to identify defendant, which was alone sufficient for his testimony to be helpful to the jury. See *Thompson*, 2016 IL 118667, ¶ 50.

¶ 63 As to the third and fourth *Thompson* factors, we agree with defendant that the surveillance video is high quality. However, despite the high quality of the video itself, defendant was not depicted well in the video. The suspected shooter's face was obscured by a balaclava during most of the time he appeared in the video, disguising his appearance. In the still photographs taken from the video, only the right side of the suspected shooter's face was visible, as he was partially turned away from the camera and the balaclava was still covering his head and neck.

¶ 64 In sum, under the *Thompson* factors, (1) Detective Larson had a general familiarity with defendant, (2) defendant was disguised in the recording with the balaclava, and (3) defendant

was not extensively depicted in the video, as his face was covered or only seen in profile. See *Thompson*, 2016 IL 118667, ¶ 51. Any one of these factors is sufficient for the trial court to determine the identification was helpful and, therefore, admissible. *Thompson*, 2016 IL 118667, ¶ 49. Thus, any objection by defense counsel to Detective Larson's identification testimony would have been fruitless, and consequently, his performance cannot have been deficient. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (stating defense counsel cannot be deemed ineffective for failing to make a futile objection).

¶ 65        Defendant has also failed to demonstrate prejudice under the second *Strickland* prong. The evidence presented at trial largely substantiates that defendant was the shooter. Defendant's cell phone location data placed him at Baker's residence and Seven Brothers Grocery at the relevant times on the day of the shooting. His cell phone records also revealed he was in regular contact with Washington earlier in the day and almost immediately following the shooting, where the two exchanged several phone calls in quick succession.

¶ 66        Baker and Washington, who were both familiar with defendant, gave descriptions of defendant that matched the suspected shooter in the surveillance video from Seven Brothers Grocery. Baker testified that the day of the shooting defendant was wearing a white shirt, a black leather jacket over his shoulder, white shoes, and a gun on his hip. He also described defendant as "short" and around "5'5." Washington described defendant as short and recalled he was wearing a white T-shirt, a brown leather jacket, and a mask. At the time, defendant was five feet, three inches tall and 23 years old. In the surveillance video from the store, the suspected shooter can be seen wearing a white T-shirt, a dark jacket over his shoulder, white shoes, and what appears to be a gun on his hip. The other witnesses who saw the shooter—Webb, Wallace, and Cutler—all gave similar descriptions of the shooter in their recorded police interviews and at trial.

¶ 67    Likewise, every eyewitness gave similar statements in their recorded police interviews as to how the shooting occurred: a short, masked individual attempted to pass a gun to Washington, who refused to take it, and the masked individual then shot Watson. The surveillance video from the CMS building shows the shooting occurred shortly after Watson confronted Washington and the masked individual. The masked individual and Washington immediately fled the scene of the shooting. The day after, defendant took an Amtrak train to St. Louis, and he did not return to Springfield until he was arrested in East St. Louis about a week later. See *People v. McNeal*, 88 Ill. App. 3d 20, 25 (1980) ("[P]roof of flight by an accused in a criminal case is admissible as a circumstance tending to show consciousness of guilt.").

¶ 68    Finally, the trial court gave the jury a limiting instruction to ensure Detective Larson's identification testimony would not invade the province of the jury. The jury instruction stated,

> "You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording. It is for you to determine what weight[,] if any[,] should be given to that evidence. In determining the weight to be given to this evidence[,] you should not draw any inference from the fact that the witness is a law enforcement officer."

See *Thompson*, 2016 IL 118667, ¶ 59 (directing the trial court to instruct the jury on the weight to give to an officer's lay opinion identification testimony). Thus, the court clearly instructed the jury to decide how much weight, if any, to give to Detective Larson's identification testimony.

¶ 69    We find trial counsel's alleged failure to object to Detective Larson's lay opinion identification testimony did not prejudice defendant. Absent Detective Larson's testimony identifying defendant in the surveillance video, there is no reasonable probability the result of the

proceedings would have been different. Therefore, we find defendant's ineffective assistance of counsel claim fails.

¶ 70                               C. Cumulative Effect of Alleged Errors

¶ 71          Finally, defendant argues that even if defense counsel's errors individually do not amount to ineffective assistance, the cumulative effect of counsel's alleged errors deprived him of a fair trial. We have found the record is inadequate to assess defendant's first claim of ineffective assistance of counsel. We further rejected defendant's second claim of ineffective assistance as it failed to satisfy either prong under *Strickland*. Therefore, a cumulative error analysis is unnecessary.

¶ 72                               III. CONCLUSION

¶ 73          For the reasons stated, we affirm the trial court's judgment.

¶ 74          Affirmed.